E. BUSHNELL ELWOOD et al., Respondents, *v.* THE WESTERN UNION TELEGRAPH COMPANY, Appellant.

The general rule is well settled that, where unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, the jury are not at liberty to discredit their testimony when opposed to a mere presumption to the contrary; but this is subject to the exception that where the statements of the witness are grossly improbable, or he has an interest in the question at issue, courts and juries are not bound to refrain from exercising their judgment, and to blindly adopt the statements of such witness. (RAPALLO, J.)

It is gross negligence in the operator at a telegraph station to send over the wires a message in the name of, and purporting to come from a cashier of a bank and to be dated at another station, at the request of a party known to the operator not to be such cashier, and presenting no evidence of authority to use his name, which message, addressed to a banking house, held out such party as entitled to credit for a large amount; and this negligence occurs so within the scope of the employment of such operator as to make the telegraph company liable to the person to whom such telegram was addressed for the damages occasioned by such negligence.

(Argued April 5th, and decided May 23d, 1871.)

APPEAL from a judgment of the late General Term of the Supreme Court, in the eighth judicial district, affirming judgment for $13,193.94 in favor of the plaintiffs.

This was an action for damages sustained by the plaintiffs, who paid the sum of $10,000 on the faith of what was claimed to be a false and fraudulent message, negligently sent by the defendant, and delivered to the plaintiffs, who were bankers at Pithole, Pa. The defendant had an office at that place, as well as at Titusville, Pa. On the morning of the 12th of August, 1865, between eleven and twelve o'clock, the plaintiffs received a message from the defendant's office at Pithole, as follows:

" From Erie, Pa. ` Dated August 12th. Forwarded from Titusville, 12 M. Received August 12th, 1865.

" To Prather, Wadsworth & Co., Pithole.

" Keystone bank will pay the checks of T. F. McCarthy, to the amount of twenty thousand dollars ($20,000).

"(Insured.)                    KEYSTONE BANK."

The plaintiffs took it to the defendant's office; saw the operator at Pithole, and told him that they had brought another blundering message; that the name of the officer of the bank had been omitted. · The operator looked at the original, and said it was the fault of the other end. Plaintiff told him to send to Erie, to the bank, and get the name of either the president or the cashier to the message. The operator said it was the fault of the office at Titusville, and he agreed to send to that office and get the signature of the officer of the bank. This was done, and between three and four o'clock in the afternoon, there was received at the office at Pithole, and sent to the plaintiffs the following message:

· " From Erie, Pa. Dated August 12, 1865. Forwarded from Titusville, 12 M. Received August 12, 1865. `

" To Prather, Wadsworth & Co.

" Keystone bank, will pay the checks of T. F. McCarthy, to the amount of twenty thousand dollars ($20,000).

" JOHN J. TOWN,

" *Cashier of Keystone Bank.*"

Just before five o'clock on the same afternoon, McCarthy presented himself at the plaintiff's banking house, and drew his check for $20,000 on the Keystone Bank, on which the plaintiffs paid him $10,000, and placed $10,000 to his credit. McCarthy was never seen at Pithole afterward. On the 14th the plaintiffs learned from Mr. Town that the whole transaction was fraudulent and a forgery, and that no such telegram had ever been sent or authorized by him. It was proved that no such messages had been received at Titusville from Erie; that the operators there knew that fact; that both messages were written at Titusville, by McCarthy, at the office of the company; that the operators there knew they were so written by him before they were sent to Pithole; that McCarthy was known by that name to the operators at Titusville. The operators at the Titusville office swore positively that they did not send the second message, and it was also attempted to be shown that there was a break in the line, so that the message could not have been sent at the time it was claimed to have been. The question of fact was submitted to the jury, and found against the defendant. It was suggested by the defendant, and insisted upon, that a confederate of McCarthy's had cut the wire, and, by inserting a machine, had telegraphed the message. No proof of this, however, was offered. A third message was claimed by the operators at Titusville to have been sent from Titusville by McCarthy, as follows.

"Erie, 10th, 186 .

"To T. F. McCarthy. Forwarded from Titusville, 11th.

"I have made arrangements at Keystone Bank for you to draw on me at sight.

"H. W. HAMLIN.

"J. J. Town, *Cashier.*"

The evidence on this subject is fully referred to in the opinion.

*G. P. Lowry,* for the appellant. If a presumption be verified, it is superseded; if it is contradicted, it is destroyed. (Burrill on Cir. Ev., p. 36.) A presumption stands till the contrary is proved, and no longer. (3 Bl. Com., 371; see

also *Tibbetts* v. *Dowd*, 23 Wend., 292, 294 ; *Miller* v. *Ship Resolution*, 2 Dallas, 22 ; Best's Law of Ev., 5th Eng. ed., § 116 ; *Mitcheson* v. *Oliver*, 3 E. & B., 318 ; *Newton* v. *Pope*, 1 Com., 110 ; *Lomer* v. *Meeker*, 25 N. Y., 361 ; *U. S.* v. 9 *Packages*, 1 Paine Cir. Ct. R., 137, 141, 142.) The function of the jury beginning when there is conflicting proof to be weighed, it is not proper to allow the jury to weigh a mere presumption against positive proof. (*Rudd* v. *Davis*, 3 Hill, 284 ; 7 Hill, 529 ; *Wild* v. *Hudson R. R. R. Co.*, 24 N. Y., 430 ; *Mason* v. *Lord*, 40 N. Y., 476, 484.) When the negligent act is done in the absence of the master, and without his direction, only constructive negligence is imputable to him. (*Giblin* v. *McMullen*, Law R., 2 Privy Council, 319, 335 ; 1 East R., 105 ; *Coleman* v. *Riches*, 29 Eng. L. & E., 323 ; *Norway* v. *Grant*, 10 C. B., 665.) The burden was upon the plaintiff to prove negligence in the choice of defendant's employe. (Amer. Law Rev., 1871, 207 to 209.)

*Amasa J. Parker*, for the respondents.

RAPALLO, J.   The material question upon this appeal, is whether, upon the evidence, the court was justified in leaving it to the jury to determine whether or not the message in controversy was transmitted from Titusville to Pithole by any of the employes of the defendant at the Titusville office. The receipt of the message at the Pithole office over the defendant's wires, and its delivery to the plaintiffs by the defendant's agent, as coming from Titusville, were sufficient *prima facie*, at least, to establish, as against the defendant, that it was transmitted in the ordinary course from the Titusville office, and to throw upon the defendant the burden of disproving that fact.

But it is claimed on the part of the defendant that it was conclusively proved by the testimony of the three operators at the Titusville office, that the message was not sent from that office ; that the court should have been governed by that evidence, and itself decided the question of fact, and that it was error, in that state of the proofs, to submit it to the jury.

The only theory by which the testimony of the operators is sought to be reconciled with the conceded fact of the receipt of the message at Pithole over the defendant's wires, is that the wires were cut by McCarthy, or a confederate, at some intermediate point, and a machine there applied, whereby the message was transmitted. And it is claimed that the court was bound to solve the difficulty, by presuming that this was actually done, rather than to permit the jury to pass upon the credibility or accuracy of recollection of the witnesses.

There was no evidence in support of the theory that the wires were cut, except the physical impossibility that the message could have been transmitted by any other means, if not sent from one of the defendant's offices. It is true that there was evidence of a break in the circuit at about the time in question; but as this break occurred before two o'clock, when McCarthy applied to have his message sent, there is no ground for assuming that he had any agency in it, for it frustrated his own plan by preventing the sending of the message at two o'clock, which the defendant's agent was willing and endeavored to send, and would have sent at that time but for the break.

The defendant contends, however, that the possibility of such an interference reduces the evidence of the sending of the message from Titusville to a mere presumption, which is entirely destroyed by the positive testimony of the defendant's agents, and that their evidence must be treated as uncontradicted and unimpeached. And numerous authorities are cited in support of the proposition that neither the court or jury is at liberty to disbelieve such evidence.

It is undoubtedly the general rule that where unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, their testimony should be credited and have the effect of overcoming a mere presumption. (*Newton* v. *Pope*, 1 Cow., 110; *Lomer* v. *Meeker*, 25 N. Y., 361.) But this rule is subject to many qualifications. There may be such a degree of improbability in the statements them-

selves as to deprive them of credit, however positively made. The witnesses, though unimpeached, may have such an inte rest in the question at issue as to affect their credibility. The general rules laid down in the books at a time when interest absolutely disqualified a witness, necessarily assumed that the witnesses were disinterested. That qualification must, in the present state of the law, be added. And furthermore, it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by cir- cumstances as well as by statements of others contrary to his own. In such cases, courts and juries are not bound to refrain from exercising their judgment and to blindly adopt the statements of the witness, for the simple reason that no other witness has denied them, and that the character of the wit- ness is not impeached.

Very clear and decisive evidence was required in this case to establish that the message which came over the defendant's wires was not communicated in the natural and ordinary manner. From the necessity of the case, such evidence as there is to that effect proceeds wholly from parties having an important interest in the question. Each of them, if guilty of the negligent act, would have the strongest motive to deny it, as the admission would subject him or her to severe responsibility for the consequences. This is a controlling consideration in determining whether the statements of these witnesses should be taken as conclusive. Without imputing a want of truthfulness to these witnesses, we think that their relation to the subject-matter in controversy was of itself sufficient to take from the court the right to dispose of the case upon their evidence and to require that the jury should pass upon the weight to be given to their statements. There is also a want of distinctness in the statements of the witnesses, irrespective of any question of credibility.

The defendants claim that each of the operators positively denies sending the message in question. This, however, is not perfectly clear. Mary J. Carr testifies that McCarthy handed a message to Reynolds, who handed it to her to send,

and that she sent it, the whole of it; that she and Reynolds were in the office when it was handed to her; that it purported to come from Erie. She does not know to whom it was addressed, and she thinks it was signed by the cashier of a bank. The one signed "Keystone Bank" (Ex. B., 1) was shown to her, and she says she did not send that. A transcript of a message from Hamlin to McCarthy of August 10th was then shown to her. It is in these words:

"ERIE, 10th, 186 .

"To T. F. McCarthy. Forwarded from Titusville 11th. I have made arrangements at Keystone Bank for you to draw on me at sight.

"H. W. HAMLIN.

"J. J. TOWN, *Cashier.*"

The name of J. J. Town, cashier, appears on the left hand side of the transcript of that message. She says she thinks that is the one she sent. That that is the one that McCarthy handed in, and that she sent. Yet that was a telegram addressed to McCarthy himself, and not designating any place to which it was to be sent. There is much obscurity about this testimony. If the message contained in that paper, arrived at Titusville in McCarthy's absence, and was forwarded to him at some other place, and the paper shown was the transcript of the telegram received by McCarthy, it would be intelligible. But it is difficult to understand how he being present could have handed it in as a message to be telegraphed to himself, or how Miss Carr could send it, it not being directed to any place. The incongruity of this statement is, of itself, sufficient to cast a doubt upon its accuracy. If Miss Carr is mistaken, then, in saying that that is the message which McCarthy handed in and she sent, then her testimony that she did send one, which was handed in by him and signed by the cashier of a bank, is open to the construction that the message telegraphed by her was the message in controversy. It is shown that she was in the Titusville office on the afternoon in question; that she was the operator there in the daytime, and she has not expressly denied sending the message

in dispute.    It was not shown to her at the trial, nor was she directly interrogated in respect to it.    She was only shown the message B, No. 1, and the Hamlin message.

The recollection of Reynolds also seems to be very inaccurate.    He speaks of forwarding to Pithole, the message which McCarthy had received from Erie, signed Hamlin, changing the signature and addressing it Prather, Wadsworth & Co., and says that the body of the dispatch was the same, substantially, as those of the · 12th of August, and addressed to the plaintiffs. (Exhibits B., 1 & B., 2.)    Yet, on inspection, it is apparent that the purport of the message of the 12th, was very different from that of the Hamlin message.

The evidence as to the duration of the break in the line, is entirely too uncertain to be regarded as conclusive.    It consists of an estimate of time without disclosing any events by which it was marked or could be accurately measured.

The proof relied on as negativing the sending of the message from the Titusville office, is far from being of that clear and satisfactory character which would justify the court in determining it to be conclusive.    The question was therefore properly submitted to the jury.

That the sending of such a message in the name of the cashier of a bank, at the request of the party who was thereby held out as entitled to credit for a large amount, without any evidence of his authority to use the name of the cashier, it being dated at Erie, though known to have originated at Titusville, was an act of gross negligence, is too clear to admit of argument.

The act was done in the direct course of the employment of the agent.    The agent was placed in the office, and in the control of the instruments, to use them in transmitting messages for a compensation.    If the agent performed that duty in a negligent manner, whereby the plaintiff was injured, the principal is clearly liable.    Transactions of the most important character are daily carried on by means of telegraphic communication, and the confidence which the public is invited to and does repose in the care with which the proprietors of

these lines conduct the business, is a source of large remuneration to such proprietors. They incur a corresponding degree of responsibility, and must be held to the exercise of such care and caution as it is in their power to employ, in order to avoid being made the instruments of deception and fraud.

The question sought to be raised on the argument as to the liability of the defendant in case the act by which the plaintiff was injured were a willful wrong of the defendant's operator, is not properly before us for adjudication. The only mode in which that point was attempted to be raised on the trial, was by the motion for a nonsuit. One of the grounds of nonsuit specified was, that the defendant was not chargeable for the willful fraud of its operator. The court could not determine as matter of fact that the operator was a party to the fraud, or acting in collusion with McCarthy, and, therefore, could not properly nonsuit on that ground. If the defendant desired to have that question passed upon, he should have requested the court to submit it to the jury, and to charge as to the effect of a finding in favor of the defendant upon that point. No such request was made, and it is not necessary, therefore, now to consider what instruction should have been given in that respect, if applied for.

The remaining points are fully discussed in the opinions rendered at the General Term, and we agree with their conclusions.

The judgment should be affirmed with costs.

All concurring except Folger, J., who did not sit.

Judgment affirmed.