[No. 4948.]

# THE BANK OF CALIFORNIA *v.* THE WESTERN UNION TELEGRAPH COMPANY.

RESPONSIBILITY OF PRINCIPAL FOR ACT OF SUB-AGENT.—If the agent of a telegraph company at one of its stations, with power to delegate his authority, employs another person to transmit and receive messages, and such other person sends a false message purporting to come from the cashier of a bank, directing another bank to pay a fictitious person a sum of money, and the sender then personates the fictitious person and obtains the money, without any neglect on the part of the bank, the telegraph company is responsible to the bank for the same.

APPOINTMENT OF SUB-AGENT.—Assumed, for the purposes of the decision, that an agent of a telegraph company has no authority to appoint a sub-agent to perform his duties in sending and receiving dispatches.

LIABILITY OF PRINCIPAL FOR TORT OF SUB-AGENT.—Although a principal is not bound by a contract made in his name by a sub-agent, appointed by his agent without authority, yet he is responsible for the negligence and torts of such sub-agent, if the agent who appointed him was at the time acting in the business of his principal, and the sub-agent was transacting such business.

NEGLIGENCE OF BANK IN PAYING MONEY CHECK.—If a person presents a telegraph order for money to a bank, and represents himself to be the person named in the order, and a man of good character and standing identifies him as the person named in the dispatch, and indorses his signature to a receipt for the money as correct, the bank is not guilty of negligence in paying him the money, although it turns out that he is not the person named in the order.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

On and before January 21st, 1875, one P. L. Washburn was the sole agent of the Western Union Telegraph Company at Colusa, Colusa County, California, for the receipt and transmission of dispatches over its telegraph wires. He was also at the same time agent for Wells, Fargo & Co.'s Express, and had various insurance agencies, and employed in his general business, as his clerk, a young man who went by the name of Charles Crowell.

Washburn was a practical "Morse" telegraph operator, and Crowell also understood the same system.

Crowell was never employed by the Western Union Telegraph Company in any capacity, but Washburn frequently employed him at Colusa, to receive and transmit dispatches over the tele-

graphic wires of said company to San Francisco and elsewhere, during the month of January, 1875, and prior thereto, and allowed him during said times to have free access to the office of the company in his charge, and to the apparatus therein for sending dispatches. The dispatches sent by Crowell over the wires were received by the various operators of the company at the various points to which they were directed, and were by them delivered in the usual course of business. Crowell was known to such various operators of the company to be the operator sending such dispatches. The office of the company at Colusa, and of Wells, Fargo & Co., and the insurance agencies referred to, were all kept in one building and room. On the 19th of January, 1875, Washburn was absent from the town of Colusa, having left Crowell in charge of his office, and having authorized him in his absence to receive and transmit over the wires telegraphic dispatches, when Crowell, without the knowledge or consent, and in the absence of his employer, Washburn, sent from Washburn's office a telegram to San Francisco, in the following words:

"COLUSA, January 19th, 1875.
"To the Bank of California, San Francisco:
"Pay Charles H. Crowley twelve hundred dollars gold.
(Signed,)   "W. P. HARRINGTON, Cashier."

This telegram was written and dispatched by himself as operator.

W. P. Harrington was then Cashier of the Colusa County Bank at Colusa, where the office of the said bank was.

This dispatch was received by the San Francisco office of the Western Union Telegraph Company on January 21st, 1875, (the wires having been down between Marysville and Sacramento intermediate the day of sending and the day of receipt) and on that day was delivered by the Company to the Bank of California.

Crowell left Colusa for San Francisco on January 19th, 1875, having previously sent a telegram, he himself operating the wires at Colusa, to Charles H. Crowley, at the Occidental Hotel, signed by a fictitious name, directing him to call at Bank of California for money.

Crowell, on his arrival in San Francisco, obtained the dispatch previously sent to Charles H. Crowley, and procured a young man named George W. Spencer, a resident of San Francisco, who had made his acquaintance in Colusa, to go with him to the Bank of California to identify him.   On arriving at the bank, Crowell presented the dispatch last referred to, and stating that he was the person named therein, asked for payment to him, and referred to Mr. Spencer for identification.   Mr. Spencer, in answer to the inquiry of the Cashier as to the fact of identity, replied, "Yes, I know him."   The Cashier then wrote a receipt, of which the following is a copy:

" No. 4954.   Received, San Francisco, Jan'y 21st, 1875, from the Bank of California, Twelve Hundred Dollars, as per telegram instructions from Colusa Co. Bank.
                          " Charge Nat. G. Bk. D. O. M. & Co.
    " Dated, Jan'y 21st, 1875.   For account of Chas. H. Crowley.
    " $1200."

Crowell then receipted the same in name of Charles H. Crowley.   Spencer endorsed the receipt as follows:

                    " Signature correct.
                              " Geo. W. Spencer."

Crowell then received from the Bank of California the sum of twelve hundred dollars, gold coin, and departed from the bank with the money in his possession, and has never been seen since.

Mr. Spencer was deceived by the similarity of the names of Crowell and Crowley, and did not observe the difference between Crowell's name and the name signed by him to the receipt above recited.   He was no party to the deceit in any way.

The telegram to the Bank of California was a forgery, perpetrated by said Crowell for the purpose of fraudulently obtaining said sum of $1,200.

The crime was discovered about March 13th, 1875, upon settlement of banking transactions between the Bank of California, D. O. Mills & Co., and Colusa County Bank.   Immediately prior to the 19th of January, 1875, business had been carried on for

some time between the said Colusa County Bank, by its said Cashier, and the Bank of California, in which the telegraph of said company had been frequently used, and similar telegraphic orders had passed in which the signatures were genuine, the payees being various real persons.

The Bank of California, under the facts stated, claimed that the Western Union Telegraph Company was responsible to it for the loss thus incurred by it in paying the sum of $1,200 to Charles Crowell, by the name of Charles H. Crowley, on the authority of the forged telegram.

The Western Union Telegraph Company denied its responsibility, and the said parties agreed upon the facts, and submitted the question to the Court for its decision. The Court rendered judgment for the defendant, and the plaintiff appealed.

*S. M. Wilson,* for Appellant.

All carriers of messages are regulated by the Code. (See Civil Code, secs. 1017, 2162, 2207, 2209; Penal Code, secs. 474, 619–621, 638–641, 850, 851.)

By these sections, " a carrier of messages for reward must use great care and diligence in the transmission and delivery of messages " ; the order in which they are to be delivered is prescribed, and penalties attached for breach of duty.

The greatest secrecy is enforced under severe penalties, and everything is done to keep the contents of messages and the business transacted by telegraph from being disclosed or discovered. (See Scott & Jarnagin on Law of Tel. secs. 137, 138.)

The defendant was therefore bound to keep secret the business transacted over its wires between the two banks. Without a knowledge of that business, and of the mode of conducting it, no one could, through the telegraph, have perpetrated the fraud. Mr. Washburn, "*the sole agent* of the Western Union Telegraph Company at Colusa, Colusa County, California, for the receipt and transmission of dispatches over its telegraph wires," should not have permitted Mr. Crowell to have had access to the books, papers, and business of his agency. However innocent Mr. Washburn may have been, it was a gross neglect of his duty to

allow it, and by means of his want of due care in that respect, Crowell became fully informed of the business of the two banks, and their mode and style of telegraphing.

The next neglect of duty was in permitting Crowell, thus armed with knowledge, to have free access to the telegraphic apparatus and a full opportunity to commit the fraud.

If the case, therefore, rests upon the ground of neglect, the proof of neglect is ample. (*Elwood* v. *The Western Union Tel. Co.* 45 N. Y. 549; *De Rutte* v. *N. Y. Albany & Buffalo Tel. Co.* 1 Daly, 548; Shear & Redf. on Neg. 2nd ed. 553–560; Redf. on Car. secs. 550–565; *N. Y. & Wash. Pr. Tel. Co.* v. *Dryburg*, 35 Pa. St. 298; *Ellis* v. *Am. Tel. Co.* 13 Allen, 226; *Bowen* v. *Lake E. Tel. Co.* 1 Am. Law Reg. 685; *Sarlin* v. *Western Union Tel. Co.* 3 Ibid. 777.)

There is a class of cases where the master is not responsible for the acts of his servant, on the ground that he was not, at the time, acting in the business of his master, as where he commits a willful trespass. (*McManus* v. *Crickett*, 1 East, 106; *Vanderbilt* v. *The Richmond Turnpike Co.* 2 Comst. 479.) But in this case Fagan was in the service of the defendant, even in procuring Cashan to go upon the house. He was not, it is true, serving him properly, or according to his duty; but it was the master's business, and not his own, that he was engaged in.

In this case Crowell was engaged in the business of the company. (*Dryburg* v. *N. Y. & Wash. Pr. Tel. Co.* 35 Pa. St. 298; *Birney* v. *N. Y. & Wash. Pr. Tel. Co.* 18 Md. 341; *Phil. & Red. R. R. Co.* v. *Derby*, 14 How. 468; *Noyes* v. *Rut. & Bur. R. R. Co.* 27 Vt. 110; 1 Redf. on Railways, sec. 130 and notes, last ed.; *Phil. Wil. & Balt. R. R. Co.* v. *Quigley*, 21 How. 202; *Yarborough* v. *Bank of England*, 16 East, 6; *Hay* v. *Cohoes Co.* 3 Barb. 42; *Bloodgood* v. *M. & H. R. R. Co.* 18 Wend. 9; *Chestnut Hill Tel. Co.* v. *Rutter*, 4 Serg. & R. 6.)

*W. H. L. Barnes*, for the Respondent.

The facts stated do not establish the relation of principal and agent, or master and servant, between the Western Union Telegraph Company and Charles Crowell.

(*a*) The agent was P. L. Washburn. He was the sole agent for the Western Union Telegraph Company at Colusa, for the receipt and transmission of messages over its telegraphic wires. He was also agent for Wells, Fargo & Co. at the place, and had several insurance agencies. He employed in his general business this man Crowell, who possessed a knowledge of the Morse system of telegraphy.

Crowell was never employed by the Western Union Telegraph Company in any capacity; but Washburn directed him frequently to send dispatches, and allowed him to have access to the apparatus of the company in his charge. This was known to operators at other points.

The Civil Code (sec. 2349) provides that an agent, unless specially forbidden by his principal to do so, can delegate his powers in certain cases, *and no others.* He may delegate the performance of a purely mechanical act—an act performed without reason or reflection, from mere force of habit; also, when the agent cannot, and the sub-agent lawfully can, perform the required act; also, when there is usage to employ another to do an act, and when specially authorized by the principal to employ a sub-agent.

(*b*) If the employment of Charles Crowell did not come under one or all of these excepted cases, then, under sec. 2350 of the Civil Code, the agent who employs a sub-agent becomes himself the principal, and the sub-agent becomes his agent, and the principal of the former has no connection with the latter.

(*c*) But if the statement of facts shows, as we contend it does not, a lawful delegation by Washburn of his agency to Charles Crowell, his employee, and Crowell was authorized, under sec. 2351 of the Civil Code, to represent the Western Union Telegraph Company as Washburn himself could do, and thus the responsibility of his acts, while being a sub-agent in the company's business, was thrown on the company, we contend that the Civil Code disposes of the case in favor of the Western Union Telegraph Company.

Sec. 2338 declares what shall be the responsibility of the principal for the negligence and omission of the agent.

He is responsible to third persons for the negligence of his

agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal. He is responsible for no other wrongs committed by his agent than those mentioned in the last section, unless he has authorized or ratified them; even though they are committed while the agent is engaged in his service. (Civil Code, sec. 2339.)

(*d*) These last sections are in accordance with the letter and spirit of the common law.

Mr. Hilliard says: "A master is liable for the fault or negligence of his servant; but not for his willful, designed, intentional, or criminal injury, wrong, or trespass." (Hilliard on Torts, vol. 2, p. 422.)

Judge Story says: "Though the principal is liable for the torts and negligences of his agent, yet we are to understand the doctrine with its just limitations, that the tort or negligence occurs in the course of the agency. He is never liable for the unauthorized, the willful, or the malicious act or trespass." (Story on Agency, sec. 456, p. 589.)

To the same effect, see Shearman & Redfield on Negligence, secs. 62, 63, 64, 68; Angell on Carriers, sec. 604; Redfield on Railways, * 381; Reeve's Domestic Relations, * 356; Scott & Jarnagin's Law of Telegraphs, sec. 69; American Leading Cases, vol. 1, p. 617; Wilson & Peverly, note on p. 619; Smith's Leading Cases, vol. 1, part 2; note to Scott & Shepherd, p. 698; *McManus* v. *Crickett*, 1 East, 67; *Ellis* v. *Turner*, 8 Durn. & E. 533; *Lyons* v. *Martin*, 8 Ad. & E. 512; *Coleman* v. *Riches*, 29 Eng. L. & E. 323; *Page* v. *Parker*, 40 N. H. 68; *Foster* v. *Essex Bank*, 17 Mass. 494; *Vanderbilt* v. *Richmond T. Co.* 2 Comst. 479; *Wright* v. *Wilcox*, 19 Wend. 343; *De Camp* v. *Miss. & Missouri R. R. Co.* 12 Iowa, 348; *Phil. & Read. R. O. Co.* v. *Derby*, 14 How. 481; *Little Miami R. R. Co.* v. *Wetmore*, 19 Ohio St. 110; *Steamboat Ohio* v. *Stunt*, 10 Ohio St. 582; *Cox et al.* v. *Keahey*, 36 Ala. 340; *Thames Steamboat Co.* v. *Housatonic R. R. Co.* 24 Conn. 40; *Church* v. *Mansfield*, 20 Conn. 284; *Giblin* v. *McMullin*, Law Rep. 2 P. C. 319, 335; *Bank of Ireland* v. *The Trustees of Evans Charities*, 5 H. L. Cas. 410.

The loss of the money here sought to be recovered was immediately due to the negligence of the plaintiff.

The order which purported to come from Harrington, cashier of the Bank of Colusa, directed the Bank of California to pay $1,200 to Charles H. Crowley; and the agreed statement of facts in the case shows that the money was not in fact paid to Charles H. Crowley, but was paid to Charles Crowell. Now, suppose the order had been genuine instead of a forgery, would the payment of this money to Charles Crowell have given the Bank of California any claim or right of action against the Bank of Colusa? In my opinion it would not. The payment of the money to Charles Crowell was wholly unauthorized under any state of facts appearing in this case. The payment by the Bank of California was the result of negligence in not ascertaining that the party who applied for the money was not the party named in the dispatch purporting to come from the cashier of the Colusa bank.

By the Court, McKINSTRY, J. :

If the fraudulent acts committed by Crowell had been done by Washburn, the defendant would have been liable to an action on the case.

When a trust is put in one person, and another whose interest is intrusted to him, is damnified by reason of the neglect of such as that person employs in the discharge of that trust, he shall answer for it to the party damnified. (Lord Chief Justice Holt, in *Lane* v. *Sir Robert Cotton*, 12 Mod. 490.)

The liability of the principal, however, is not limited to instances of *neglect*, strictly speaking, on the part of the agent. There are many cases in which a master must be held liable for the willful and wrongful acts of his servants. The true ground on which the master avoids liability for most of the willful acts of his servants, when unauthorized by him, is that they are not done in the course of the servant's employment. When they are so the master is liable for them. (Shearman & Redfield on Negligence, sec. 65.)

The general doctrine of the law is that the principal is liable

to third persons for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances and omissions of duty of his agent *in the course of his employment.* (Story on Agency, sec. 452.)

The rule is founded on public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted; and thereby, in effect, he warrants his good conduct and fidelity. (Ibid. sec. 453.) Thus a carrier will be liable for the tortious conversion of the property being transmitted by his agent.

Similar principles will apply to cases like the present.

One receiving a dispatch from a telegraph company has the right to rely upon the exercise of ordinary care and prudence by the agent of the company who transmitted the message, in discharging his duty of deciding whether the sender was the person he represented himself to be. Where a "valuable" message is sent, the identity of the sender must be determined by the appropriate agent of the company, and if the agent is guilty of negligence in failing to ascertain such identity, the telegraph company is liable. (*Elwood* v. *The Western Union Telegraph Co.* 45 N. Y. 549.)

And if an agent of a telegraph company, whose duty it is to send genuine messages, shall willfully and fraudulently send a dispatch in the name of another, this wrong act is as much done "in the course of his employment," as if he had negligently sent a forged message. To this extent the person receiving the dispatch may depend on the guarantee of the company that their agent is faithful and honest; and he is equally damnified, whether the fraud is committed by the agent directly, or is successfully consummated by another by reason of the negligence of the agent. The agent is authorized to transmit messages, and the transmission of a false message—whether contrived by himself or contrived by another, and negligently sent by him—is within the course of his employment.

If the wrong had been done by Washburn, the case would

come clearly within the law as declared by sec. 2338 of the Civil Code:

"Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, *including wrongful acts committed by such agent in, and as a part of, the transaction of such business,* and for his willful omission to fulfill the obligations of the principal."

If, therefore, plaintiff is correct in its claim that Washburn had power to delegate his authority to Crowell, the judgment of the Court below in favor of the defendant, the telegraph company, was incorrect.

But I shall assume that Washburn had no authority to appoint a sub-agent to perform functions like his own, or any functions for or on behalf of defendant. His office as agent of the company was highly confidential, and the company had a right to rely on his performance of his duties personally. He had exclusive charge of the office and operating machinery at that place, and it was part of his duty, not only to see that messages were faithfully transmitted and delivered, but to preserve the secrecy of telegraph correspondence inviolate, and to use every proper precaution to prevent access to the employment of the wires, and to preclude the reading of dispatches.

Article V of Title IX of the Civil Code is not determinative of the case before us. The sections of that article are but declaratory of the common law, and are applicable to the same cases as would be the common-law rules there announced had the Civil Code never been adopted.

But beyond these rules, there is another dependent on public policy, which takes effect without reference to the relations between a principal and sub-agent with regard to matters of contract.

A principal is not bound by a contract made in his name by a sub-agent, appointed without authority, even where it is precisely the contract which his agent is empowered to make. But the question here is, whether defendant is liable for the *negligences* or *frauds* of Crowell.

From the proposition that the principal is not bound by the

contracts made in his name by such pretended agent—" it might not unreasonably be inferred that he could not be made liable for the *torts* of one whose *contracts* would not bind him. On the other hand, there is a manifest inconvenience certain to ensue to the public at large from thus shifting the responsibility from masters who, as a class, are able to meet it, and who receive the benefit of the service, upon servants, who, as a class, are entirely unable to compensate for the injuries thus caused. Public policy, therefore, requires that masters should be held liable for the consequences in such cases ; and so the Courts have held them, although without laying down any general rule upon the subject." (Shearman & Redfield on Negligence, sec. ~~145,~~ and cases there cited.)

*Althorf* v. *Wolfe*, 22 N. Y. 365, was an action brought by the administrator of one killed by ice thrown from the roof of defendant's house. Fagan, defendant's servant, had been directed to remove the snow from the roof, and without authority from defendant engaged one Cashan to assist. Counsel for defendant requested the Court to charge the jury that if they found that the relation of master and servant did not exist between the defendant and Cashan, and that Cashan actually threw the snow and ice that struck the deceased and caused his death, the defendant was not responsible. The charge was refused, and the Court of Appeals sustained the Court below in its refusal. (22 N. Y. 364.) In the same case, Denio, J., said : " The defendant intrusted the removal of the snow and ice from the roof to one of his servants. I admit that this servant ought not to have taken his friend on the premises, but that he should have done the work himself, and moreover that it was a piece of misconduct to admit Cashan upon the roof ; and if Fagan did not know Cashan to be a discreet and prudent man, it was an act of negligence. But the defendant, by giving him charge of the business, and permitting him to have access to the roof, enabled him to take others there. The defendant does not and cannot deny that he is responsible for the negligent and wrongful acts of Fagan. If it had been certain that it was that person, and not Cashan, who threw the piece of ice which killed the deceased, the defendant would clearly have been responsible.

Instead of accomplishing the mischief in that manner, Fagan, *by a negligent and improper act,* enabled Cashan to do it.   If we keep in mind that the defendant is responsible for the acts of Fagan, and that Fagan took his comrade on the roof, and thus enabled the latter to do the mischief, it is difficult to discover any principle which will shield the defendant from responsibility.   It is not necessary to consider Cashan as the defendant's servant.   He was rather the instrument by which Fagan, for whose conduct the defendant was undeniably responsible, did the wrong."     *     *     *     *     *     *

" There is a class of cases where the master is not responsible for the acts of his servant, on the ground that he was not at the time acting in the business of his master, as where he commits a willful trespass.   (1 East, 106 ; 2 Comst. 479.)   But in this case Fagan was in the service of the defendant, even in procuring Cashan to go upon the house,   He was not, it is true, serving him properly, or according to his duty ; but it was the master's business, and not his own, that he was engaged in."

If it be admitted that it was the duty of Washburn to preserve the telegraph machinery at Colusa intact, it must be manifest that if he had so negligently guarded it as that one had gained access to and used it as a means of fraud, the defendant would have been responsible.   Of course this must be understood as requiring of him only such reasonable precautionary measures as a prudent man would deem necessary under all the circumstances.

It certainly would be a strange thing if, while the defendant would be responsible, had Crowell committed the fraud by reason of a want of proper care on the part of Washburn to prevent his getting within reach of the telegraph machine, the defendant is not responsible, because Washburn actually delivered over the conduct of the business of telegraphing to Crowell, and voluntarily gave him the control of the means of committing the fraud.

Such is not the law.   Applying the language of Denio, J., in *Althorf* v. *Wolfe,* Washburn was engaged in his master's business, not his own.   It was part of his duty to keep Crowell from using the wires.   He failed to discharge this duty, and the prin-

cipal is equally responsible, whether the placing of Crowell in charge was a "wrongful act committed as a part of the transaction of the business," or was mere negligence.

I am unable to discover any negligence on the part of the plaintiff in failing to make proper inquiry of the witness Spencer as to the identity of the man who presented the dispatch with the *Crowley* therein named.

" On arriving at the bank Crowell presented the dispatch last referred to, and stating that he was the person named therein, asked for payment, and referred to Mr. Spencer for identification. Mr. Spencer, *in answer to the inquiry of the Cashier as to the fact of identity*, replied, ' Yes ; I know him.' "

It is admitted that Spencer acted in good faith, and was no party to the fraud. He must be presumed to be a man of good character and standing, on whose statement the Cashier had a right to rely, as truthful ; and, as it seems to me, his reply amounted to a positive statement that the person present was the person named in the dispatch. If Spencer had not seen the dispatch, or was not sufficiently acquainted with *Crowell* to know that his name was not *Crowley*, this was his want of care rather than that of the Bank.

But the Cashier was not content with the oral declaration of Spencer. He wrote a receipt which was signed by Crowell in the name " Charles H. Crowley," in the presence of Spencer. Spencer then indorsed the receipt : " Signature correct : Geo. W. Spencer."

I cannot resist the conviction that Spencer believed Crowell's name to be *Crowley*, and if so, it cannot be said that the Cashier was guilty of neglect, if Spencer was a man of good name and credit ; and there is nothing in the transcript to indicate the contrary.

Judgment reversed, and cause remanded for a new trial.