BANK OF PALO ALTO v. PACIFIC POSTAL TEL. CABLE CO.

(Circuit Court, N. D. California. July 11, 1900.)

No. 12,760.

1. PRINCIPAL AND AGENT—LIABILITY OF PRINCIPAL FOR TORTS OF AGENT—SCOPE OF AGENCY.

Where it was a part of the regular business of a telegraph company to transmit money-order messages between banks, such company is liable, both under the general principles of law, and under Civ. Code Cal. § 2338, relating to the liability of principals, to a bank for a loss occasioned by its payment, without negligence, of such an order which was forged and transmitted in the usual manner, and through the company's regular agents, by an operator in its employ whose duty it was, under his employment, to transmit such messages. In such case the act of the agent in transmitting the false message, although fraudulent and unauthorized by his principal, was within the apparent scope of his employment, and, if the message had been genuine, would have been within his actual authority, and it was only by reason of his employment that he was enabled to consummate the fraud.

2. SAME—EXEMPLARY DAMAGES.

A principal, though liable to make compensation for the willful and fraudulent acts of an agent done within the scope of his employment, cannot be subjected to exemplary or punitive damages on account of such acts.

3. DAMAGES—CONVERSION—ATTORNEY'S FEES.

Under Civ. Code Cal. § 3336, providing that the damages recoverable for wrongful conversion shall include "a fair compensation for the time and money properly expended in pursuit of the property," reasonable attorney's fees properly expended by one in recovering a large part of a sum of money obtained from him through the fraud of another's agent, for which the principal is liable, are recoverable as an element of compensatory damages in an action against the principal.

Action at law for the recovery of money paid out on a fraudulent telegraphic order, and to obtain damages for fraudulent conversion.

Joseph Hutchinson, for plaintiff.

Lloyd & Wood, for defendant.

MORROW, Circuit Judge. This is an action at law brought by a California corporation, as plaintiff, to recover from a New York corporation, as defendant, (1) a sum of money paid out by the plaintiff upon a fraudulent telegraphic order sent over the defendant's wires by an employé of the defendant; (2) the amount expended by the plaintiff in counsel fees and sundry expenses incurred in the endeavor to recover the money; and (3) to obtain punitive damages. The suit was first brought in the superior court of the state of California for the county of Santa Clara. Thereafter the cause was removed to this court upon the petition of the defendant, stating the diverse citizenship of the parties and the jurisdictional amount in controversy. The suit was the outgrowth, as disclosed by the pleadings and proofs, of the following circumstances: On December 27, 1898, the plaintiff was carrying on a banking business in the town of Palo Alto, in this state; and the defendant was conducting the business of a telegraph company in California, with offices at Los Angeles, San Francisco, and Palo Alto, and other cities and towns. At about noon of the day mentioned, a telegram was received by the plaintiff, through the agent of the defendant at Palo Alto, dated at Los Angeles, Cal., December 27, 1898,

and reading: "To Bank of Palo Alto: Please pay Harry L. Cator eight hundred and forty dollars. Waive identification. We remit to-day. Farmers' and Merchants' Bank." Several times during the morning a man giving the name of Harry L. Cator had called at the bank and asked if a telegraphic order in his favor had been received; and he had at one time exhibited to the cashier of the defendant bank a telegram, written upon one of the ordinary blanks of the defendant, and in the handwriting of the agent of the defendant at Palo Alto, dated at Los Angeles, Cal., December 27, 1898, in these words: "To Harry L. Cator: Money sent through bank to-day. J. H. Fisher." A few minutes after the receipt by the defendant of the aforesaid telegraphic order, the man representing himself as Cator called at the bank, and was, without further identification, paid the amount specified in the telegram. The evidence shows that Cator, after receiving the $840, went at once to San Francisco, and there acted in such a manner as to attract the attention of the police department, with the result that he was arrested that evening. On the following day his arrest was reported to the plaintiff. The plaintiff then made inquiry of the Farmers' & Merchants' Bank of Los Angeles, and learned that the telegraphic order on which the money had been paid was forged. It then instructed its attorney in San Francisco to take such steps as were necessary to recover the money, if it could be recovered. The attorney, acting with the police department, gave considerable attention to the matter, with the result that a confession was obtained from Cator that the money had been fraudulently secured by him, through a conspiracy between himself and one Minkler, a telegraph operator in the employ of the defendant at San Francisco. Cator then made an assignment of the amount still in his possession, some $788, to the plaintiff. This assignment and the $788 were left in the hands of the chief of police of San Francisco for some five or six months, pending a settlement between the parties. In June, 1899, by agreement, the amount was turned over to the plaintiff. Various other services were rendered by the plaintiff's said attorney in the endeavor to recover the entire $840, for all of which services he was paid by the plaintiff the sum of $250. Plaintiff now seeks to recover the entire sum of $840 paid out upon the fraudulent telegram, with interest; the sum of $250, counsel fees, as aforesaid; and the further sum of $28.34, alleged to have been expended in the pursuit of said money; also, $1,000 by way of punitive damages,—aggregating $2,118.34.

The first question to be determined is whether, under the facts of the case, the telegraph company is responsible for the wrongful act of its employé in sending the false telegram. It appears that the defendant was holding itself out to the public as a telegraph company, and that the plaintiff bank had dealt with it in that capacity; that a part of its transactions with the defendant consisted in the paying out by the bank of money upon telegraphic orders received through the agent of the defendant at Palo Alto. In the San Francisco office of the defendant one Minkler was employed as an operator, and, among his duties, he was authorized to transmit the telegraphic money orders to operators employed by the defendant in other towns, including the one at Palo Alto; these operators having no knowledge of the origin

of the telegrams, other than that received from the operators in the San Francisco office. To the mind of Minkler, an opportunity was thus presented for fraudulently obtaining money. He concocted the message with which this suit is concerned, in simulation of those often passing through his hands, and transmitted it to the operator at Palo Alto as a genuine telegram from the Farmers' & Merchants' Bank of Los Angeles. There was nothing in the message or in the manner of its transmission to indicate to the operator there that it was not genuine, and it was therefore delivered to the plaintiff in the customary manner. Minkler's accomplice, a man representing himself as the payee mentioned in the telegram, presented himself at the bank to receive the money, exhibiting to the bank officials another telegram, purporting to come from Los Angeles over the defendant's wires, saying that the money had been sent that day. Although the telegraphic order particularly waived identification of the payee, the cashier of the bank took the precaution to make inquiries of the telegraph operator at Palo Alto as to whether the telegram was all right, and received a reply in the affirmative. He then paid the money to the supposed payee mentioned in the telegram. Plaintiff contends that the defendant is responsible for these acts of Minkler, under the law as contained in section 2338 of the Civil Code of California. This section provides that:

"Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business."

In support of this principle, plaintiff cites the cases of Bank of California v. W. U. Tel. Co., 52 Cal. 280; McCord v. Telegraph Co., 39 Minn. 181, 39 N. W. 315, 1 L. R. A. 143; and Elwood v. Telegraph Co., 45 N. Y. 549, 6 Am. Rep. 140. The first of these cases presents a state of facts very similar to those involved in the case at bar. The regularly appointed agent of the telegraph company at Colusa, Cal., employed a man by the name of Crowell to assist him in his duties. Crowell frequently received and transmitted dispatches over the wires of the company in the place of the regular agent. During the absence of the agent he sent a false telegram to the Bank of California, in San Francisco, to pay Charles H. Crowley $1,200 in gold, signing the telegram, "W. P. Harrington, Cashier." Harrington was then cashier of the Colusa County Bank, and frequently sent similar messages to the Bank of California. Crowell then went to San Francisco, procured a resident of San Francisco, who had made his acquaintance in Colusa, to go with him to the bank and identify him, and secured the money; the friend identifying him not noticing the difference between the names Crowley and Crowell. The court held that, if the fraudulent acts committed by Crowell had been done by the regularly appointed agent of the company, the company would have been liable, and that the principal was equally responsible, whether the placing of Crowell in charge by the agent was a wrongful act committed as a part of the transaction of the business, or was mere negligence, under the requirements of public policy.

The next case (McCord v. Telegraph Co., 39 Minn. 181, 39 N. W. 315, 1 L. R. A. 143) follows the same rule. There the regularly appointed telegraph operator himself forged the telegram and secured the money. The court held the telegraph company responsible, under the rule that:

"Where the business with which the agent is intrusted involves a duty owed by the master to the public or third persons, if the agent, while so employed, by his own wrongful act occasions a violation of that duty, or an injury to the person interested in its faithful performance by or on behalf of the master, the master is liable for the breach of it, whether it be founded in contract, or be a common-law duty growing out of the relations of the parties. 1 Shear. & R. Neg. (4th Ed.) §§ 149, 150, 154; Tayl. Corp. (2d Ed.) § 145. And it is immaterial in such case that the wrongful act of the servant is in itself willful, malicious, or fraudulent."

The third case (Elwood v. Telegraph Co., 45 N. Y. 549) was a suit brought to recover damages against the telegraph company for having paid $10,000 on the faith of a fraudulent message transmitted to the plaintiffs. It was not determined as a fact that the operator of the defendant company was a party to the fraud; it being claimed by the telegraph company that the wires had been used by some ouside party unknown to the agent, and the fraud thus accomplished. But the court held that:

"The act was done in the direct course of the employment of the agent. The agent was placed in the office, and in the control of the instruments, to use them in transmitting messages for a compensation. If the agent performed that duty in a negligent manner, whereby the plaintiff was injured, the principal is clearly liable. Transactions of the most important character are daily carried on by means of telegraphic communication, and the confidence which the public is invited to and does repose in the care with which the proprietors of these lines conduct the business is a source of large remuneration to such proprietors. They incur a corresponding degree of responsibility, and must be held to the exercise of such care and caution as it is in their power to employ, in order to avoid being made the instruments of deception and fraud."

It is contended by the defendant, on the other hand, that the act of Minkler was willful, wanton, and criminal, not committed in the service of the defendant, and not within the line of Minkler's duty or the scope of his employment, and therefore that the defendant should not be held liable. It is claimed that the California case cited by plaintiff (Bank of California v. W. U. Tel. Co., 52 Cal. 280) is distinguished from the one at bar, in that the negligence of the regular agent of the telegraph company in allowing another to transact the business of the company was the underlying basis of the action, and that anything said by the court as to the liability of the company if the fraudulent act had been committed by the regular agent was wholly outside of the case, and must be considered as dictum. In support of this contention the defendant cites a later decision by the same court, in the case of Stephenson v. Southern Pac. Co., 93 Cal. 558, 29 Pac. 234, 15 L. R. A. 475, in which it claims a different rule of law is announced, as follows:

"The rule is, of course, well settled that the master is civilly liable for the wrongful or negligent act of the servant committed while in his service, and within the scope of his employment; that is, in the transaction of the master's business. And the converse of the rule is equally well settled,—

that when a servant acts without any reference to the service for which he is employed, and not for the purpose of performing the work of his employer, but to effect some independent purpose of his own, the master is not responsible in that case for either the act or omission of the servant."

And in substantiation of this statement the court says:

"The rule of law which makes the master liable to respond in damages for the act or omission of the servant 'implies that the master will not in any case be liable for wrongs committed by the servant while not acting within the scope of his authority. This rule is so reasonable that the grounds on which it rests need scarcely be suggested. In all the affairs of life, men are constantly obliged to act by others, but no one could venture to so act if the mere circumstance that he employed another to act for him about any general or particular business made him an insurer against all wrongs which such person might possibly commit during the period of such employment. * * * In other words, if the servant steps aside from his master's business, for how short a time soever, to commit a wrong not connected with such business, the relation of master and servant will be for the time suspended. 2 Thomp. Neg. 885, 886.' "

Upon the state of facts presented in that case, the court decided that the employé committed a wanton act, entirely without the scope of his authority. Having reached that decision upon the facts, the application of the rule of law just quoted was undoubtedly correct. And, following that order of investigation in the case at bar, the question arises, was the employé, Minkler, acting within the scope of his authority when he committed the act complained of? In the case of Reynolds v. Witte, 13 S. C. 5, 36 Am. Rep. 678, an agent had fraudulently misappropriated negotiable collaterals deposited with him on a loan of his principal's money; and it was argued that, while masters are responsible for injuries done by the negligence of their servants while acting within the scope of their employment, they are never liable for injuries willfully committed, where the agents have other purposes than executing their masters' orders. The court, in discussing the question of the "scope of agency," said:

"It is difficult to understand upon what ground the principal should be held liable for the negligence of his agent, and not for his fraud, where the act is done or omitted to be done to the very property as to which the agency exists, and in the course of the agency. Fraud by which the property is lost is generally considered one of the forms of gross negligence. What is the proper understanding of the phrase 'within the scope of the agency'? Does 'the scope' include negligence and exclude fraud? It cannot properly be restricted to what the parties intended in the creation of the agency; for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question cannot be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act, and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal neither negligence nor fraud is within 'the scope of the agency'; but, tested by the connection of the act with the property and business of the agency, fraud in taking the very property is as much 'within the scope of the agency' as negligence in allowing others to take it. The proper inquiry is whether the act was done in the course of the agency, and by virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent."

The same reasoning is followed in the case of Dougherty v. Wells, Fargo & Co., 7 Nev. 368, 373, where the plaintiff delivered an old certificate of deposit to the agent of the express company for the purpose of having it sent to San Francisco to be renewed, and the agent fraudulently procured it to be cashed, and appropriated the money to his own use. The court held that the express company was liable, for the following reasons:

"The liability, however, in such case arises not upon the rule that the agent acted for the principal in that particular transaction, but because he is employed by the principal in that character of business, and is so held out as a person authorized and fully to be trusted therein. When the agent in such case does an act which is apparently within the general scope of his authority, although not so in fact, if the principal were not held liable for the act, a third person, who had reason to believe that the agent was reliable, and possessed authority in the particular matter, from the general character of his employment, might suffer loss. Hence the law holds the principal liable, upon the ground that he, rather than a third person equally innocent, should suffer."

Cooley, in his work on Torts (2d Ed.), very tersely states the rule governing this class of cases, on page 629, as follows:

"The test of the master's responsibility is not the motive of the servant, but whether that which he did was something his employment contemplated, and something which, if he should do it lawfully, he might do in the employer's name."

Viewing the facts of the case at bar in the light of the doctrines above enunciated, it is apparent that, although the act of Minkler in reality exceeded the scope of his employment, as contemplated by his employer, it was an act which would have been lawful if it had been honest. It was committed while he was engaged in and about the business assigned to him, and it was by reason of such assignment, and the character of the duties he was required to perform, that he was enabled, with the assistance of a confederate, to commit the fraud upon the plaintiff. The business with which he was intrusted involved a duty owed by the telegraph company to the public,—a duty which third persons dealing with the telegraph company in good faith were warranted in presuming would be faithfully performed. And, although the defendant's employé acted in violation of this duty and of his authority, yet the defendant would be held responsible, on account of its own obligation to the parties dealing with it. This principle is well stated in Bank of Batavia v. New York, L. E. & W. R. Co., 106 N. Y. 195, 12 N. E. 433, and cases cited,—that, where an agent has been clothed by his principal with power to do an act, in case of the existence of some fact peculiarly within the knowledge of the agent, and where the doing of the act is in itself a representation of the existence of that fact, the principal is estopped from denying its existence, as against third parties dealing with the agent in good faith, and in reliance upon the representation. In the present case the plaintiff bank took the precaution to make special inquiry of the defendant's agent at Palo Alto as to the correctness of the telegraphic order in controversy, and, upon receiving an affirmative reply, relied upon such repre-

sentation, and acted accordingly. No further care or caution was obligatory upon it. If it had telegraphed to the purported sender of the message at Los Angeles, the telegram would probably have passed through the hands of the same operator in San Francisco, and the fraud could have been repeated. If inquiry by mail had been resorted to, the acknowledged object of the telegraphic service would be defeated, as no saving of time would be accomplished. Under such circumstances as these, if the principal could secure immunity from the fraudulent acts of its agent, the confidence and security necessarily reposed in the operations of telegraph companies would be utterly destroyed, and their service in transactions of importance be rendered worthless, as public corporations of that character would serve as a too ready means of subterfuge for the weak and criminal minded. Minkler was acting within the line of his known powers, and any loss arising from his dishonesty, when acting within the apparent scope of his agency, should be borne by those who enabled him to perpetrate the fraud, rather than by those who innocently suffered. Warren-Scharf Asphalt Pav. Co. v. Commercial Nat. Bank, 38 C. C. A. 108, 97 Fed. 181, 186.

The next question relates to the measure of damages. The plaintiff claims that, in addition to compensation for the actual loss suffered, it should be awarded punitive damages. Exemplary or punitive damages are always penal in theory, and are only imposed for the sake of punishment, or by way of example, in addition to compensatory damages, where the defendant has acted with malice or guilty intention. While the employé of the defendant in the present case is shown to have acted with intent to defraud in sending the forged telegram, he is personally punishable for that crime; and there the punishment must cease, as the defendant neither authorized nor ratified the employé's act, and cannot be held liable in exemplary damages, upon the principle that no person should be punished for that of which he is not guilty. This question is thoroughly discussed in the case of Railway Co. v. Prentice, 147 U. S. 101, 107, 13 Sup. Ct. 261, 37 L. Ed. 97, and the rule there announced has been unvaryingly followed in the consideration of similar cases. Railway Co. v. Russ, 6 C. C. A. 597, 57 Fed. 822; McGehee v. McCarley, 33 C. C. A. 629, 91 Fed. 462. Mr. Justice Gray said:

"Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender and as a warning to others, can only be awarded against one who has participated in the offense. A principal, therefore, though, of course, liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive, or malicious intent on the part of the agent. * * * In Keene v. Lizardi, 8 La. 26, 33, Judge Martin said: 'It is true, juries sometimes very properly give what is called "smart money." They are often warranted in giving vindictive damages as a punishment inflicted for outrageous conduct. But this is only justifiable in an action against the wrongdoer, and not against persons who, on account of their relation to the offender, are only consequentially liable for his acts, as the principal is responsible for the acts of his factor or agent.'"

Many cases from the various state courts are cited to the same effect. And, applying this rule to corporations as well as to indi-

viduals, the early case of Hagan v. Railroad Co., 3 R. I. 88, 91, is cited, as follows:

"In cases where punitive or exemplary damages have been assessed, it has been done upon evidence of such willfulness, recklessness, or wickedness on the part of the party at fault, as amounted to criminality, which, for the good of society and warning to the individual, ought to be punished. If in such cases, or in any case of a civil nature, it is the policy of the law to visit upon the offender such exemplary damages as will operate as punishment, and teach the lesson of caution to prevent a repetition of criminality, yet we do not see how such damages can be allowed where the principal is prosecuted for the tortious act of his servant, unless there is proof in the cause to implicate the principal, and make him particeps criminis of his agent's act. No man should be punished for that of which he is not guilty. * * * Where the proof does not implicate the principal, and, however wicked the servant may have been, the principal neither expressly nor impliedly authorizes or ratifies the act, and the criminality of it is as much against him as against any other member of society, we think it is quite enough that he shall be liable in compensatory damages for the injury sustained in consequence of the wrongful act of a person acting as his servant."

The only injury that plaintiff, in its banking business, can have suffered by reason of the detention of its property, is the expense incurred in its recovery, and the loss of interest on the amount detained; and therefore the only damages that could be awarded would be in the nature of compensatory damages, comprising in amount the money originally paid out on the fraudulent telegraphic order, interest thereon until recovery, and the outlays in the pursuit of the recovery of the property. Civ. Code Cal. § 3336. In the latter class of expenditure the plaintiff includes $250 paid out to its attorney as compensation for his services in the endeavor to recover the lost money prior to the commencement of this action. Section 3336, subd. 2, of the Civil Code of California, providing the measure of damages for detriment caused by the wrongful conversion of personal property, includes "a fair compensation for the time and money properly expended in pursuit of the property." The question whether this "compensation" may include counsel fees has not been clearly decided by the state court in its interpretation of this section, though in some instances such fees have been allowed as proper and necessary expenditures (McDonald v. McConkey, 57 Cal. 325; Greenbaum v. Martinez, 86 Cal. 459, 25 Pac. 12), even where expended in the prosecution of the action for damages. The principle is not only just in equity, however, but sound in law, that all the actual damages to which a party may be put by the fraud of another should be recoverable. From the evidence in the case at bar, it is clear that the attorney rendered services to the plaintiff of the reasonable value of $250; that these services were largely instrumental in establishing the guilt of defendant's employé, and in saving the greater portion of the stolen money for the rightful owner, whoever that might be adjudged to be. The necessity for paying such counsel fees arose from the fraud of the defendant, through its employé, and the payment thereof is an actual damage the plaintiff has sustained. Under these circumstances, it is certainly "money properly expended in pursuit of the property," and recoverable, under section 3336 of the Civil Code. Let a judgment be entered in accordance with this opinion.