## STREICHER v. THIRD AVE. R. CO.

(Supreme Court, Appellate Division, First Department. April 21, 1899.)

CARRIERS—INJURIES IN ALIGHTING FROM A CAR—WITNESS—IMPEACHMENT—
    VERDICT.
    Plaintiff, suing for injuries caused by alighting from a street car, alone testified to the accident. In response to a motion for a bill of particulars, he denied knowing the number of the car, yet on the trial gave it to his lawyer. He testified that two men who picked him up gave him their addresses, yet one had known him before, and testified he did not see the accident, and the other was not produced. Plaintiff testified he was 14 months in bed as a result of the injury, and had done no work. His physicians testified he was in bed 2 or 3 months, and during that time would go out, and visited them at their offices. It was proved plaintiff worked as a night watchman at $7 a week for 11 months between the accident and the trial. He testified he spent $125 for medicines, but could not give the name of a single shop where he spent any part of the money. *Held*, that the witness was thoroughly impeached, and a verdict based on his testimony alone should be set aside.

Appeal from trial term, New York county.
    Action by Samuel Streicher against the Third Avenue Railroad Company. There was a judgment for plaintiff, and defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Herbert R. Limburger, for appellant.

M. P. O'Connor, for respondent.

BARRETT, J. This judgment cannot be sustained. It is impossible to read the record without seeing that the verdict was obtained by suppression of fact and false swearing. The plaintiff was the only witness who testified with regard to the actual occurrence which resulted in the accident. He was entirely uncorroborated upon the salient question of the defendant's alleged negligence. As to the damages, he was contradicted even by his own witnesses. His testimony throughout was calculated to mislead the jury. It was presented with specious artifice, which was evidently the result of careful preparation. The plain intention from the time of the accident down to the trial was to suppress all information upon the subject, and thus to deprive the defendant of an opportunity for inquiry. At the foundation of this purpose lay the plaintiff's false oath with regard to the number of the car from which he claims to have fallen. The accident is said to have occurred on the 16th day of April, 1895. It was, according to the plaintiff's story, a north-bound cable car. He says he was a passenger on such a car, and that at his request it was stopped on Third avenue, near the corner of Sixteenth street; that while he was then attempting to alight the car was suddenly started, and he was thrown down, and dragged half a block. The defendant heard nothing of such an occurrence, and knew nothing of the plaintiff's claim, until this action was brought against it some weeks later. The most diligent inquiry thereafter failed to identify the occurrence, or to give the defendant the slightest clue thereto. Thereupon the defendant demanded a bill of particulars, and quite naturally asked, among other things, for the number of the car. Upon the answer to this demand depended the defendant's hope of getting at the truth of the case. Failing in that respect, it would, in the nature of things, be remitted to a general inquiry throughout its entire system. The plaintiff's sworn answer to this vital demand was "that the number of the car on which plaintiff was a passenger as alleged in the complaint is not known to plaintiff." This statement was absolutely false. Upon the trial the plaintiff was forced to admit that at the time of the accident a man named Zooner picked him up, and gave him a card upon which the number of the car was written. "He gave it to me on a card," the plaintiff testified. "His name was on that card, and the number of the car which I was hurt on was on that card. * * * I had it in my pocket when I went to see my lawyer. * * * I know the number of the car was on the card what I gave to Mr. O'Connor,"—the latter being his attorney. It is not entirely clear whether the plaintiff gave O'Connor the card before or after the latter prepared the bill of particulars. If it was before, then the attorney must have been particeps criminis. But, whether before or after, the plaintiff thus fraudulently suppressed a vital fact, and was guilty of false swearing to effect that suppression. We may add that there was not a word of explanation on this

subject from either the plaintiff or O'Connor. But, further, the plaintiff testified that there were two men who, when he was picked up, gave him their names and addresses. One, named Leonardt, was called as a witness, and testified that he knew the plaintiff before the accident. Why this acquaintance should have given the plaintiff his name and address is not apparent. He does not corroborate the plaintiff in this particular. His testimony is otherwise quite unimportant. He did not see the accident, and all he knew about it was that he observed two men carry the plaintiff over on the east sidewalk. The other person, however (Zooner), must have seen the accident, and his testimony would have been most material. It was he who picked the plaintiff up, and gave him the number of the car, "the same minute," says the plaintiff, "when I was hurt." The plaintiff testified, both on his direct and cross examination, that Zooner lived at 210 East Thirty-Sixth street. And yet Zooner was not called as a witness. The plaintiff evidently saw the necessity of making some excuse for his failure to do so. He testified that he gave Zooner's address to O'Connor. He could not, therefore, shield himself under the pretense of ignorance or neglect of counsel. What, then, was the excuse? One Buckley was called, who testified that he did business in O'Connor's office, and investigated cases for him; that at O'Connor's request he went to look up and subpœna Zooner at the address given him by O'Connor, which address was in East Sixty-Third or Sixty-Fourth street, east of Second avenue. Why he was sent there—why O'Connor did not send him to 210 East Thirty-Sixth street—was left wholly unexplained. O'Connor had the right address, so the plaintiff testified, and yet sent his subpœna server somewhere else. It is plain that the object was to avoid finding the witness, and yet to make a shallow pretense of looking him up. This is not all. The plaintiff distinctly testified that he "was fourteen months in bed" as the result of the accident, and that from the date of the accident down to the time of the trial he had done no work. In both particulars he was impeached,—in the former by his own physicians, who tell us that he was able during the period in question to visit them in their offices; in the latter, by proof which compelled a subsequent retraction. Dr. Tarler testified that the plaintiff was in bed but about two or three months, and even during these two or three months "he used to go out for a bit, of course, and lay down." Both physicians (Dr. Berg as well as Dr. Tarler) testified that the plaintiff visited them at their offices not long after the accident. Their entire testimony is quite inconsistent with the possibility of the plaintiff having been in bed for 14 months. As to the inability to work, it was proved that the plaintiff was actually employed as a night watchman in a tailoring establishment for something like a year between the time of the accident and the trial. This proof, as already suggested, compelled a retraction. The plaintiff was recalled, and he then admitted that he was thus employed, and earned seven dollars a week for 11 months. He declared that he only meant, in his previous testimony, to say that he had done nothing in his trade. On referring to that previous testimony, however, we find that there was no qualification. "After I got hurt, I can do nothing the whole time,"

he said. "I have done nothing since I was hurt." He was then asked the following precise question, and gave the following answer: "Q. Have you done any other kind of work other than tailoring? A. I worked not at all." There were still other flagrant suppressions. He claims to have spent $125 for medicines, and yet he could not name a single shop where any part of the money was paid.

There is no question here of the weight of evidence as between witnesses on the respective sides. The defendant was cheated out of the possibility of calling eyewitnesses to the occurrence. It furnished such testimony as the circumstances permitted. "A witness," as was said by Rapallo, J., in Elwood v. Telegraph Co., 45 N. Y. 554, "may be contradicted by circumstances as well as by statements of others contrary to his own." We have here an uncorroborated plaintiff, who is contradicted by himself and by others on the most vital points of the case, and who has been most thoroughly and completely impeached. It would be a grave reproach to the administration of justice if a verdict founded solely upon such testimony should be permitted to stand. There is no rule which requires such a result. It is true that the jury are the sole judges of the credibility of witnesses. It is apparent, however, that the jury here misapprehended the scope and effect of the facts and circumstances which the record discloses. Then, too, there is a qualification to the conclusiveness of a jury's decision, even upon a question of credibility. Its verdict upon that head may savor of prejudice or bias quite as much as its verdict upon the weight of conflicting evidence. Upon either head an appellate court should act with extreme caution in disturbing their findings. But it should not shrink from its plain duty in a proper case, and especially when, upon all the facts and circumstances, justice demands the exercise of its well-defined power. The rule is a reasonable one that when the verdict cannot be sustained by any impartial or intelligent consideration of the evidence it should be set aside. The cases are numerous where verdicts founded upon the uncorroborated, contradictory, and improbable testimony of a single witness have been set aside. We have the converse in Sheridan v. Mayor, etc., 8 Hun, 424, where it was held that the uncontradicted evidence of an interested party is not necessarily conclusive upon the court or jury. In Boyd v. Colt, 20 How. Prac. 384, where it appeared that the plaintiff wrote a letter before the commencement of the action flatly contradicting his testimony upon the trial, the court said that "the jury were bound to disregard his oath." The same doctrine was maintained in Nutting v. Railway Co. (Sup.) 16 N. Y. Supp. 673, and in Becker v. Railway Co., 87 Hun, 317, 34 N. Y. Supp. 1134. In the former case the plaintiff's evidence was found by the appellate court to be "so contradictory and unsatisfactory that a verdict based upon it should not be permitted to stand." In the latter case the headnote reads (and it is a correct summary) that: "The testimony of a party to an action, upon which the judgment rendered therein in her favor was largely based, is insufficient to sustain the judgment if it is rendered unreliable by her incorrect testimony in one instance and her failure to remember certain facts and circumstances, as likely to be in her memory as those facts upon which the case depended, and in

respect to which latter she testified with great particularity." In Clark v. Bank, 11 Daly, 239, the action was to recover an alleged bank balance, being the aggregate of 23 checks paid by the bank, but not produced as vouchers. The plaintiff was his sole witness. He testified, not that he did not draw the checks, but that he did not draw them for the amounts stated. The bank gave satisfactory evidence as to seven of the checks that the plaintiff did in fact draw them, and the jury disallowed these seven checks, but gave the plaintiff a verdict for the others. The verdict was set aside, the court holding that, as the jury had found the plaintiff unworthy of credit as to the seven checks, they were bound in consequence to reject his unsupported oath as to every other matter in controversy. In Conklin v. City of Dubuque, 54 Iowa, 571, 6 N. W. 894, a verdict was set aside below where the only evidence given was the testimony of the plaintiff, which was in some respects contradictory and inconsistent. It was held that this was within the discretion of the court, although (because the defendant introduced no testimony) there was no conflict of evidence. A verdict may be said to be "contrary to the evidence," as that expression is used in section 999 of the Code of Civil Procedure, when it is so clearly against its weight as to make it apparent that the jury were misled, or were influenced by partiality, passion, or undue bias. So, too, a verdict is contrary to the evidence when it is founded solely upon the testimony of an interested plaintiff, who is discredited to such an extent as to make it apparent, either that the jury misapprehended the scope and effect of the discrediting circumstances, or that, apprehending, they disregarded them capriciously or from bias. The present case is an extreme illustration of a verdict of the latter kind. It probably resulted from misapprehension of the force and effect of the group of circumstances to which we have adverted. Some of these circumstances were obscured by artifice, and others were necessarily developed upon the trial with less incisiveness than when a single controlling and striking fact is presented. But the circumstances were there, and they were either disregarded or not clearly taken in.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.