AARON HARRIS

v.

MONTAGUE P. BARRETT et al.

[Decided April 14th, 1909.]

1. One seeking to foreclose a bond and mortgage made to another has the burden of proving that he is the owner of the bond and mortgage.

2. The court is not bound to accept everything as true a witness may say, and evidence, to be believed, must not only proceed from a credible witness, but it must be credible in itself.

3. In a suit to foreclose a bond and mortgage, evidence *held* not to show that complainant is the assignee or rightful owner of the bond and mortgage, defeating a recovery.

Heard on bill, answer, replication and proofs in open court.

This is a bill to foreclose a mortgage, and the facts will be stated in the opinion.

*Mr. Samuel C. Cowart* (with whom was *Mr. Meyers* of the New York bar), for the complainant.

*Mr. Benjamin P. Morris* (with whom was *Mr. Jacobson* of the New York bar), for the defendants.

GARRISON, V. C.

Henry J. Barrett owned a property at Long Branch, New Jersey. On the 31st of January, 1887, Louise Barrett, his wife, joined in a mortgage to Philip Levy for $2,800, payable in three years, at five per cent. interest. This bond and mortgage were produced in court and claimed to be owned by Aaron Harris. Harris is a nephew of Barrett. Barrett and his wife did not live happily together and frequently separated from each other for short periods of time.

After one such separation, and as an element in the reconciliation, Barrett, in June of 1890, conveys this Long Branch property, through a trustee, to his wife.

On the 18th day of October, 1901, Mrs. Barrett secured a decree of divorce from her husband in the supreme court of New York. Alimony at the rate of $12 per week was ordered paid. He defaulted in his payments, and in 1903 or 1904, was committed to jail in contempt proceedings.

Upon the complainant, of course, rests the burden of proving that he is the owner of the bond and mortgage which he seeks to foreclose. He and Barrett each testify that the mortgage was obtained from the mortgagee, Levy, some time in the year 1888, about eighteen months after its date and about eighteen months before it was due.

There is, of course, a very apparent motive or reason for fixing some period before 1890 as the time when Harris became possessed of the mortgage, because in 1890 the title became vested in Mrs. Barrett, and Barrett could not, of course, as against her, renegotiate the mortgage if it should be held that he had paid it off, and he certainly would not dare suggest that he had paid the mortgage off after that period, because his testimony is that he was constantly at odds with his wife and would not likely pay $2,800 solely for her advantage.

However this may be, they, as a matter of fact, each fix the period when Harris became possessed of the bond and mortgage as some time between May and July of 1888. They do not agree as to the time, and the testimony of each varies at different times as to the date. They testify that at the time Harris got from a man named Cohen $2,800, in currency and brought it to Bar-

rett, who took it to Levy and obtained the bond and mortgage, and gave them to Harris, who gave them to Cohen, who held them for twelve or thirteen years and then gave them to Harris.

Excepting the bond and mortgage there is no writing of any kind, sort or description to cast any light upon any portion of the transaction. There is no assignment, no receipts, no letters, no checks, and the entire case depends upon the testimony of witnesses.

The determination of the case, therefore, will depend upon what the court finds to be true from the testimony of these witnesses; and, with respect to whether this mortgage was paid or was purchased, the determination will depend largely, if not wholly, upon the view taken by the court of the testimony of Harris and of Barrett, when tested by itself and by such other slight facts as it was possible to prove in contradiction or opposition thereof.

At the time when they allege that the mortgage was obtained from Levy it had at least half of its life to run; that is, it was not due for about a year and a half. The mortgage drew five per cent., and Harris testifies that the land was worth more than the amount of the mortgage. At that time Barrett was a well-to-do business man. He is shown to have owned the property subject to the mortgage, the house in which he and his family lived in New York, three large tenement house properties on the Bowery in New York, and to have had considerable money besides. Harris was a clothes cutter, working for small wages, and having absolutely no means whatever.

Both Harris and Barrett allege that Barrett was very much perturbed because this mortgage would be due in a year and a half and he feared that the mortgagee would press him for the money, and that the anticipation of this situation wrought him up to such an extent that he went around a year and a half before the mortgage was due searching for someone to take it up, and being willing, if they would do so, to agree to pay them six per cent. interest instead of five per cent., upon the chance that the person who would take up the mortgage would not press him so vigorously as he feared the mortgagee would. In this state of mind he turns to this impecunious nephew. Harris

avers that he thereupon went to an uncle of his wife, named. Cohen, and represented to him that there was this good mortgage for $2,800 at five per cent., which would be raised to six per cent., and that his uncle said that if the property was good he would advance the money, and immediately did so, without making any investigation or inspection or seeking any legal assistance. According to Harris, he obtained the money from his uncle immediately after mentioning the matter to him, and there is not the slightest pretense that the uncle employed anybody to see that the mortgage was good, or that the property was worth the money, or, in fact, hesitated long enough to have even considered these matters himself.

Harris thereupon immediately brings the $2,800 thus obtained to Barrett. Harris' testimony makes it utterly impossible to determine what the relation between Cohen and him was with respect to this money. He refers at times to it as a loan; he says he borrowed the money; again, he speaks of it as money given to him by his uncle; sometimes he says: "He gave me the money," but does not specify whether that merely refers to the act of handing it over, or whether he means to imply that it was a gift.

His testimony is no more satisfactory with respect to the relationship which he and Cohen held with respect to the bond and mortgage. As to them, he says that he took them immediately upon obtaining them from Barrett, and gave them to Cohen, and that Cohen put them in a trunk and kept them there for twelve or thirteen years. He gives various reasons for his conduct in this respect. At times he said that it was to show his uncle that he was honest; that it was as security for the money; that he took it to his uncle because he had put the money in them and he wanted his uncle to have the papers, and that he took them to Cohen for safekeeping.

After thirteen or fourteen years, for no reason which is given or suggested, Cohen handed the papers back to Harris.

Harris and Barrett aver that from 1888 to 1904, Barrett paid to Harris six per cent. interest on $2,800, in semi-annual payments. When examined separately, Barrett testified that he always obtained written receipts from Harris for each payment

of interest made him during all these years. And Harris testified that he never gave written receipts at any time to Barrett. It is quite obvious that this is not a matter about which there could be any honest difference of opinion, or honest failure to remember. It involves thirty-two separate incidents; that is, thirty-two semi-annual occasions upon which a receipt either was or was not given, and, with respect to each one of these thirty-two occasions, Barrett says he obtained a written receipt (all of which he claims to have lost), and Harris avers (without having heard of Barrett's statement) that he never gave any receipts.

Clearly one of the parties is guilty of false swearing in this important particular, and, in my view, both of them are so guilty with respect to the very matters at issue. I am not able to believe (and my disbelief is strengthened by the appearance and manner of the witnesses on the stand) that this poorly-paid young clothes cutter obtained $2,800 in currency from his wife's uncle in 1888, and invested it, without investigation, legal assistance or written papers, in this bond and mortgage, and held them for eighteen or nineteen years without any effort to collect the same—particularly in view of the fact that the only person outside of himself who, as he claims, had any reason to consider was Barrett, and Barrett, after 1890, had no title to this property, and the title was in his wife, with whom he was at odds and from whom, in 1901, he was divorced.

Further, I am utterly unable to believe that Barrett, from 1888 to 1904, continued to pay six per cent. interest to Harris upon this bond and mortgage upon property to which he lost title in 1890, such payments, if made, being wholly in favor of his wife, with whom he was on the outs, and from whom he was divorced, as I have before stated, in 1901.

When we consider that in 1903 or 1904 he was committed to jail for failure to pay the alimony due his wife, and yet claims that during the very period in which he incurred this penalty he was paying interest on this bond and mortgage solely to favor his wife, his story, to my mind, lacks all credibility.

The wife, one of the defendants in this suit, was necessarily limited in her ability to directly meet the testimony of Harris

and Barrett. She and her sister do testify to conversations in 1888 concerning the payment by Barrett of this mortgage. They swear that at the time he was in possession of considerable money and was talking of how he should invest it, and that his wife's father suggested that he pay off this mortgage, and Barrett told them afterwards that he had done so; and, also, when angry at his wife, referred with bitterness to the fact that he had paid it off. His wife says that this statement was made after he had conveyed the property to her and had quarreled with her and was angry that he had paid off a mortgage, which, if he had not done so, would rest upon property now owned by her, and he would be benefited by having the money instead of having benefited her by its payment.

There is also some slight evidence of a loan by Barrett to Harris some years after the mortgage was alleged to belong to Harris; and there is uncontradicted evidence that several fires have occurred upon the premises, and that the insurance has been collected by Mrs. Barrett, Harris not having paid any attention to whether there was insurance on the property or not, and during all of the eighteen or nineteen years that he claims to have owned the mortgage not having paid the slightest attention to the property on which the mortgage was claimed to be a lien.

Harris, who is never shown to have had a dollar in his life, waives all this aside with the statement that $2,800 did not seem much to him, and that accounts for the light way in which he treated this matter. This really is characteristic of his entire testimony, and is a cogent reason, in my mind, for disbelieving him and his entire story. Bluntly stated, I do not believe his testimony or Barrett's testimony. I do believe that Barrett paid this mortgage off, with his own money, and for some reason, or no reason, did not attend to its cancellation at that time, and that years afterwards, and after he had conveyed the property to his wife and had quarreled with her and desired to injure her, he handed this bond and mortgage over to his nephew in order that the latter might foreclose the same and either obtain the money out of the land the husband had conveyed to the wife, or take the land away from her by a sale.

As a trier of fact, I have reached the unshaken conclusion that Harris is not a *bona fide* holder of this bond and mortgage; that he did not procure the same by assignment from Levy; that he did not procure the same by the advancement of any money thereon, and that he has no right to hold the same as a valid subsisting lien as against Mrs. Barrett, the owner of the land.

The sole question that I paused to consider after the trial, and upon which I have taken the briefs of counsel, is whether, in view of the fact that Harris and Barrett each swore to that which would lead to a contrary decision, I was bound to take their testimony upon points which the defendant was not able to contradict. I have reached the conclusion that I am not so bound. Without attempting to formulate a doctrine, I find that a trier of facts must be left free to believe or not to believe testimony which is subject to question.

"The court is not bound to accept everything as true a witness may say. Evidence to be believed, must not only proceed from the mouth of a credible witness, but it must be credible in itself— such as the common experience and observation of mankind can approve as probable under the circumstances. We have no test of the truth of human testimony, except its conformity to our knowledge, observation and experience." *Daggers* v. *Van Dyck* (*Vice-Chancellor Van Fleet, 1883*), *37 N. J. Eq.* (*10 Stew.*) *132.* And see to like effect *Elwood* v. *Western Union Telegraph Co., 45 N. Y. 549; Kearney* v. *Mayor, &c., 92 N. Y. 617.*

When I weigh and test the evidence of these two witnesses, Harris and Barrett, I am utterly unable to believe that either of these two men, situated as they were, could or would have behaved as they testify they did. There is really nothing credible in their testimony about any one important circumstance concerning which they testify. There is nothing credible in Barrett's suggested reason for desiring to obtain an assignee of the mortgage at the time that he says he sought one, and there is nothing credible in his statement as to the circumstances under which he got the money from Harris. Harris's testimony with respect to the important facts is equally incredible. That a poorly-paid, impecunious young man should obtain for the asking $2,800 from an uncle of his wife, and should hand it over

to his own uncle for a mortgage about which he knew nothing, and should not obtain any writing from the owner of the mortgage to show that he relinquished his ownership or transferred it, and should not have consulted any business man or lawyer concerning the matter, and should have parted with the possession of what he claims was his for twelve or thirteen years, and during eighteen or nineteen years have paid no attention whatever to the real estate upon which the alleged mortgage rested, and should, if he did get interest, not give receipts, and not have any checks, assignments, receipts or other writings of any description concerning the matter, present points of improbability so strong that I was not, at the time of hearing his story, and am not now, after reading it over, able to believe any of it.

And when the motive of these two men at the time that this foreclosure was begun is suggested, I think their whole conduct seems clear.

The opportunity arose when Barrett discovered, after many years, as I believe, that he still had this old bond and mortgage, which he had paid off either in 1888 or at some later period. He was divorced from his wife and had gone to jail at her procurement because he did not pay her alimony. And here was a chance to make her suffer either the payment of this money or the loss of the property. There was practically no one so usable in this emergency as this nephew, and to him he gives the bond and mortgage, and through him he seeks to carry out this scheme.

I do not find that it is proven that Harris is the assignee or rightful owner of this bond and mortgage, and therefore find that the complainant may not succeed, and will decree accordingly.