## Western Union Telegraph Company v. Uvalde National Bank.

### No. 1224.  Decided December 21, 1903.

**1.—Telegraph Company—Forged Message—Liability Dependent on Negligence.**

Though telegraph companies are, by the rule prevailing in the United States, held liable to the addressees as well as to the senders of telegrams for failure to properly discharge the obligations undertaken, they are not warrantors of the genuineness of the messages delivered, nor liable for loss occasioned to the addressee by reliance on a forged telegram where they are guilty of no negligence.  (Pp. 224-227.)

**2.—Same—Prima Facie Case—Rebutting Negligence.**

Where plaintiff proved loss by his action, without negligence on his part, on a telegram delivered to him as coming from, but not in fact sent by W., he made a prima facie case calling on the telegraph company to exculpate itself; and this burden was not met by proof that a swindler, by tapping the wires between stations, had, without the company's knowledge, taken off the message to W. and replied in his name, in the absence of proof as to the possibility and adoption of precautions by the company against being so imposed on.  (Pp. 227, 228.)

**3.—Same—Tapping Wires—Fact Case.**

A swindler, tapping the telegraph wire between San Antonio and Uvalde, intercepted a message from a bank at the latter place to one at the former inquiring whether a draft by his accomplice would be honored by it, and sent an affirmative reply in the name of the San Antonio bank, on which the Uvalde bank cashed such draft.  Held, that the evidence (for which see the opinion) sustained a finding against the telegraph company for the amount of the loss, based on its negligence, inferred from the absence of a showing of care by it to prevent such imposition.  (Pp. 221-229.)

Error to the Court of Civil Appeals for the Fourth District, in an appeal from Uvalde County.

The Western Union Telegraph Company prosecutes error upon the affirmance, upon its appeal, of a judgment recovered against it by the bank.

*Norman G. Kittrell, Webb & Finley,* and *M. S. Haltom,* for plaintiff in error.—The court should have instructed the jury to return a verdict in favor of the defendant at the conclusion of the introduction of the plaintiff's testimony, as shown by special charge number 1, requested by defendant, which special charge is made a part of this assignment, for the following reasons, to wit:  1.  Because the uncontradicted evidence introduced by the plaintiff failed to show that the defendant was guilty of any negligence in the transmission and delivery of any or either of the telegrams about which the plaintiff complains in its peti-

tion. 2. Because the uncontradicted evidence showed that the plaintiff sustained its damages by reason of the negligence or contributory negligence of the cashier of the plaintiff bank, he having failed to require anyone to vouch for C. W. Fisher or to require the said Fisher to furnish a proper identification of himself, or the necessary proof that he was entitled to receive the said sum of money. Elwood v. W. U. Tel. Co., 45 N. Y., 549; Lowery v. W. U. Tel., Co., 60 N. Y., 198; Bank v. Telegraph Co., 30 Ohio St., 555; Joyce on Elec. Law, sec. 775; W. U. Tel. Co. v. Neill, 57 Texas, 288; Thompson on Law of Elec., secs. 137, 138, 139; Shearm. & Redf. on Neg., 5 ed., sec. 537; W. U. Tel. Co. v. Rosentreter, 80 Texas, 416; Joyce on Elec. Law, secs. 16 and 17.

When the plaintiff's testimony shows beyond controversy that it sustained loss through its own fault or contributory negligence, it becomes the duty of the court to instruct a verdict in favor of the defendant. Express Co. v. Hertzberg, 17 Texas Civ. App., 100; United States v. Bank, 45 Fed. Rep., 163; Peoples Bank v. Franklin Bank, 6 Law. Rep. Ann., 724; Deposit Bank v. National Bank, 7 Law. Rep. Ann., 849, and note; Trust Co. v. National Bank, 50 Law. Rep. Ann., 75, and note; Emporia Bank v. Shotwell, 57 Am. Rep., 171; Robertson v. Coleman, 141 Mass., 231; Joyce on Elec. Law, secs. 773, 774, and notes; Railway Co. v. Jones, 95 U. S., 441.

In order to charge appellant with actionable negligence, it must reasonably appear from the testimony that it foresaw, or by the exercise of ordinary care could have foreseen, that Fisher and his coimpostor or some other wicked person would probably use appellant's telegraph instrumentalities and appliances under the circumstances in perpetrating a fraud. Shearm. & Redf. on Neg., sec. 11; Railway Co. v. McEwen & Murray, 38 Law. Rep. Ann., 134; 16 Am. and Eng. Enc. of Law, 418, note 1.

If a telegraph company is in default, but its default is made mischievous to a plaintiff only by the operation of some other intervening cause, such as the dishonesty of a third person, the rule "causa proxima non remota spectatur" applies, and the company can not be made responsible for the loss occasioned by the act of such third person. Joyce on Elec. Law, sec. 775.

The court erred in refusing defendant's special charge number 6, to the effect that if defendant's agent and operator at Uvalde station exercised ordinary care in receiving the message from San Antonio, purporting to have been sent by John Wood & Sons, saying they would cash Fisher's draft, and that after so using ordinary care he believed in good faith that the message was genuine, and so believing received and transmitted it to the office of the Uvalde Telegraph Company at Uvalde, then they should find for the defendant; because said charge was affirmatively upon the leading issue in the case, and the issue was not submitted to the jury in so direct a form in the general charge. Smithwick v. Andrews, 24 Texas, 488; W. U. Tel. Co. v. Andrews, 78 Texas, 305;

McGown v. Railway Co., 85 Texas, 289; Leach v. Wilson County, 68 Texas, 353.

The court erred in refusing to give defendant's special peremptory instruction contained in special charge number 8, reading as follows: "You are instructed that the cause of the failure of the defendant to transmit the message to John Woods & Sons was the unlawful interference with the defendant's wires by an impostor or a wicked third party, whose act was unknown to the defendant, and for whose acts the defendant was in nowise responsible, and you will therefore return your verdict in favor of the defendant;" because said uncontradicted evidence was to the effect stated in said charge, namely, that the defendant's wires were tapped by third persons, for whose acts it was in nowise responsible, and against which it could not by the exercise of that measure of diligence required by law provide, and which it could not prevent. Joske v. Irvine, 91 Texas, 574; Railway Co. v. Kieff, 94 Texas, 334; Railway Co. v. Choate, 90 Texas, 82; Railway Co. v. Bigham, 90 Texas, 223; Douglass v. Railway Co., 90 Texas, 125; Lefevre v. Elec. Light Co., 93 Texas, 604; Elliott on Railroads, 1702.

*Ellis, Garner & Love* and *R. L. Ball,* for defendant in error.—A telegraph company which has been granted valuable franchises and privileges by the public, and which holds itself out to the public as a transmitter, for which service it receives a valuable and adequate consideration, should be held, on the ground that public policy requires it, to be insurer of the identity of the persons from whom, and the office from which, all messages involving cash transactions, purport to come. Joyce on Elec. Law, secs. 18, 19; Gray on Com. by Telegraph, 16, 130; Thompson on Law of Elec., 169; W. U. Tel. Co. v. Dubois, 128 Ill., 248; W. U. Tel. Co. v. Yopst, 118 Ind., 248; Elwood v. W. U. Tel. Co., 45 N. Y., 549; Pac. Postal Tel. Co. v. Bank of Palo Alto, 109 Fed. Rep., 369; Bank of California v. W. U. Tel. Co., 52 Cal., 280.

WILLIAMS, Associate Justice.—The judgment brought in review by this writ of error was recovered by the bank against the telegraph company upon the facts which are stated in detail in the opinion of the Court of Civil Appeals. In substance they are that two impostors, calling themselves Fisher and Rief, conspired together to obtain money from the bank by means of forged telegrams sent over the defendant's telegraph lines. Fisher had been around Uvalde for some days and had made the acquaintance of some of the employes of the bank, and claimed to have been buying cattle at Cline. On August 16, 1900, Rief tapped the wire at a point near Uvalde station and between it and San Antonio, and, by means of other wires connected with it, attached an instrument in such way as to enable him to send messages to Uvalde, and to intercept and receive messages from that place intended for San Antonio. He then sent to Fisher, in care of the bank at Uvalde, this message, purporting to come from San Antonio, dated August 15th: "We

will advance forty-five hundred your wire Cline. (Signed) Jno. Woods Sons." The firm whose name appeared signed to the message were bankers in San Antonio. This message passed over defendant's wire to its office at Uvalde station, was received by the telegraph operator and, through a private telegraph line operating between the station and the town of Uvalde, was transmitted to and delivered to the president of the bank. Within a few minutes after its receipt Fisher inquired of the president for a telegram to himself, and upon receiving this one, opened and showed it to the president and proposed to draw upon Jno. Woods Sons for $4500. This the president refused to permit him to do without confirmation of the message. The president then wrote out and delivered to the owner of the private telegraph line connecting with defendant's office at the station this message: "Uvalde, Texas, Aug. 16, 1900.—John Woods Sons, San Antonio, Texas: Will you pay draft of C. W. Fisher $4500? Answer quick. Uvalde National Bank." This was transmitted to and received by defendant's agent at the station and he undertook to send it on to San Antonio, but it was intercepted by Rief and never reached that place. Before any answer to it was received, Rief sent this telegram: "Kansas City, Mo., 15th.— To Bank of Uvalde, Texas, Uvalde, Texas: If our representative Mr. Fisher calls, please notify go ahead and contract for balance of Moore cattle. (Signed) Scruggs Hall Co.," which was duly received by the bank. Later Rief also sent the following message in answer to that from the bank to John Woods Sons: "San Antonio, Texas, Aug. 16th.—To Uvalde National Bank, Uvalde, Texas: Yes; we will honor C. W. Fisher's draft for forty-five hundred. (Signed) John Woods Sons." The bank thereupon received Fisher's draft on the San Antonio bankers for $4500, paid him $1200, and gave him a letter of credit for the remainder. All of the messages received by the bank were of course forgeries, and on the next day the fraud was discovered.

The evidence justified the conclusion of the Court of Civil Appeals that the operation of tapping the wire commenced as early as 7:40 a. m. of August 16th, and that about four hours elapsed between that time and the receipt of the last message. It also appears that each of the offices of the defendant is designated in sending telegrams by what is termed a "call," consisting of certain letters, and each of its operators has a private signature used in telegraphing, which is also a letter. The call for San Antonio was "S. A." and that for Uvalde station was "D. A." In sending a telegram from the former to the latter place, the sending operator would call "D. A." and sign "S. A.," and add his private signature. This custom was observed by Rief in sending the messages in question, the call and signature being correctly given. How he learned the private signature of the operator at San Antonio is unexplained, but the evidence indicates that this is not ordinarily of much importance, as operators along the line are not acquainted with the signatures of all others and pay little attention to them. It does sufficiently appear, however, that knowledge of the call for Uvalde station

was essential in order to reach it by wire, and that it was communicated to Rief by defendant's operator at a neighboring station a few days before the fraud was perpetrated. Whether these signals were in use as a precaution against impositions such as that in question, or were merely employed for brevity and convenience in conducting the business, is not clearly revealed by the evidence. So far as it goes, the evidence rather tends to raise the inference that they were not regarded by the employes as a safeguard and that they would be ineffectual, as such, to prevent such frauds. The operator who disclosed the call to Rief states that there was nothing unusual in giving such information to a casual inquirer professing, as Rief did, to be an operator; and both he and the only other witness who testified on the subject state that anyone acquainted with telegraphy, listening about the station, could learn the calls from the sound of the instrument. There is no evidence that employes were required to keep these things secret. At the same time one of them states: "The system we used was an up to date system. As far as I can say, I think the methods used by the telegraph company since I have been an operator have proven sufficient for all practical purposes to transact the business by telegraph for the public." Unless the usages described are such, the evidence shows that no precautions are taken by the company by which the genuineness of messages passing over its wires may be tested and forgeries detected, although the witnesses say that it is within the power of any expert operator at any time to tap the wires and send and control messages as was done by these swindlers, and that no operator can tell where a message goes or whence it comes except from what they are told by those controlling the wire and manipulating the instrument. The evidence as to the practicability of devising safeguards against such abuses of the telegraph is meager and unsatisfactory. Both of the operators say they know of no method in use. One of them says: "Nothing could be done which would make it very difficult for parties like this man to perpetrate these frauds, because that man was in a position to learn all such signals. I do not know that they could devise means as against everyone except telegraph operators by which it would be almost impossible to perpetrate these frauds. I suppose they could." The other, for forty years an operator, says: "I think there could be a code of signals adopted by which messages could be identified as coming from the station from which they purport to come; I never thought of the matter before, but still I think there could be."

This cause was so tried in the District Court as to make the decision here depend upon the broad question whether or not there is in the facts any basis for the judgment holding the telegraph company liable for the loss of the $1200 sustained by the bank. Some complaints are made of rulings of the trial court on incidental questions, but we find nothing in them requiring any addition to what the Court of Civil Appeals has said, and we shall confine our discussion to the fundamental question just stated.

The charge of the trial judge made the right of plaintiff to recover depend upon a finding of negligence on the part of defendant; but counsel for plaintiff contend for a more stringent rule, under which defendant would be treated as having represented to plaintiff the authenticity of the message that caused the damage, and held bound absolutely to make good the truth of such representation, or to compensate for the loss occasioned by its falsity. We are unable to sustain this view, regarding it as not only unsupported by correct authority, but as contrary to the principles established by this and other courts governing responsibility of telegraph companies. The English courts directly and distinctly repudiate the idea that the delivery of a message by a telegraph company constitutes a representation to the person to whom it is delivered, of authority from the person whose name is signed to it. Playford v. The United Kingdom, etc., Telegraph Co., 4 Law Rep. (Q. B.), 706; Dickson v. Reuters Telegraph Co., 2 C. P., 62; same case on appeal, 3 C. P., 1. Those cases also hold that the addressee of a message has not, merely as such, any cause of action against the telegraph company for negligence in its transmission and delivery. This is based upon the propositions that the contract is wholly between the company and the sender of the message, where he is not the agent of the addressee, and that there is no privity of contract between the company and the addressee; that the duty of the company is wholly contractual and not imposed by law, and that, as breach of a duty is essential to actionable negligence, the addressee can not hold the company liable on the ground of negligence. This is not the law as established in the United States generally and in this State. Telegraph companies, as they exist here, are charged by law with the performance of duties to those who employ and rely on them and are alike responsible to the senders and addressees of messages for losses resulting from their failure to properly discharge that duty. With this duty in mind, we do not see how it can be truly said that there is no representation, at all, in the delivery by such a company to one person of that which purports to be a telegraphic message from another. The act of delivery does contain an assertion that the message was received by the company, at the point from which it purports to come, from him who appears to be the sender, and that it was transmitted by the company over its wire to the place of delivery. This much is, it seems to us, necessarily true, because the receipt, transmission and delivery of messages is precisely the service which the company holds itself out as performing, and this is what the delivery imports to those accustomed to rely upon such means of communication. But is the representation absolute and unqualified?

In May v. Western Union Telegraph Company, 112 Mass., 90, a declaration, considered on demurrer, in one count alleged in substance that the defendant negligently delivered to plaintiff a telegram purporting to have been sent by certain persons which had not in fact been so sent, by reliance and action on which plaintiffs sustained loss; and in an-

other count alleged that "defendant falsely represented to the plaintiffs that it was authorized to send the message, whereas it was not authorized." Both counts were held good. Little is said in the opinion about the first count. As will be observed, it charged negligence on the part of the company in the delivery of a message never sent and was held good for that reason; and the ruling upon it is not authority for the proposition that a delivery of a message never sent by him whose name is signed to it, without negligence on the part of the company, would render it liable. Of the other count the court said: "In an action against a telegraph company for delivering a message never sent, and alleging that the defendant falsely represented that it was authorized to deliver such a message, and thereby caused the plaintiff to send goods and suffer damages, it is not necessary to allege that it was done with intent to deceive, or that it was false within the knowledge of the defendant. It is not an action for deceit. It is an action in the nature of a false warranty against one acting as agent, who represents that he has authority when he has not. Whether such representation is made in terms, or tacitly and impliedly, he supposing but not knowing the fact to be true, he is liable to the person misled. Jefts v. York, 10 Cush., 392; Bartlett v. Tucker, 104 Mass., 336, and cases cited. Nor in such an action for false representations is it necessary for the plaintiffs to allege that they used due care and diligence to ascertain if the representations were true. Nor do any presumptions arise in this case from the subject matter of the alleged false representations that make such an allegation necessary." This is not a holding that the mere delivery of a false message constitutes an absolute representation or warranty that it is true, or is what it purports to be. The allegation was that the company represented that it was authorized, etc. This could have been sustained by proof of an actual representation of authority in addition to the mere delivery of the message. The decision therefore rests upon the principles of law concerning liability for false representations of agency, or of other facts, which need not be discussed at length. They are stated in many authorities of which the following give condensed and accurate summaries: Bishop on Non-Contract Law, secs. 330, 1211, 1212; Smout v. Ilberry, 10 Mees & W., 1. Many cases have occurred in which telegraph companies have been required to compensate persons damaged by reliance on false and fraudulent telegrams, all of them based upon an express finding of negligence, which would have been superfluous had there existed so stringent a rule as that contended for by the plaintiff in this case. Elwood v. W. U. Tel. Co., 45 N. Y., 549; Bank of California v. W. U. Tel. Co., 52 Cal., 280; Pac. Postal Tel. Co. v. Bank of Palo Alto, 54 Law. Rep. Ann., 713; McCord v. W. U. Tel. Co., 39 Minn., 181; Strause v. W. U. Tel. Co., 8 Biss., 104. In none of these cases was it asserted that the telegraph company, by delivering a message, warranted its integrity, or represented, absolutely and unconditionally, that it was sent by the person

who appeared to be its sender; but in all of them negligence was assumed, and in some of them declared, to be an essential element. That such companies are not insurers of the accuracy of messages delivered by them has passed into a truism. It has generally been affirmed as applicable to mistakes and alterations occurring in transmission, but we can not see why it is not equally applicable here. A message delivered by a telegraph company which, through error in transmission, differs materially from one actually delivered to the company to be sent is, in law, as truly a message never sent by the person purporting to be its sender as that here in question. If it be found that there was no fraud or negligence in either case, why should a guaranty of accuracy or authenticity be implied in one case more than the other? The reason given why mistakes in transmission, without negligence, do not give rise to liability, is that the media through which telegraph companies must perform their duty are uncertain and sometimes uncontrollable in their action, and the process of telegraphing is such that excusable mistakes on the part of the agents transmitting and receiving easily occur; which considerations have been thought to make it unjust to require more of such companies than that they avoid miscarriages and mistakes so far as, with proper care and circumspection, it is practicable to do so. The subject of interferences with their apparatus by strangers does not appear to have received much discussion, probably for want of occasion. In stating the reasons why the responsibility of insurers is not imposed, the Court of Civil Appeals of Kentucky, in Smith v. Western Union Telegraph Co., 83 Ky., 104, uses this language: "The wire is exposed to the interference of strangers; a surcharge of electricity in the atmosphere, or a failure of or irregularity in the electrical current, may stop communication; and it is continually subject to danger from accident, malice and climatic influence when the company has not the actual, immediate custody of the message, as the common carrier has of the merchandise it carries; and it should not, therefore, like a common carrier, be treated not only as a bailee, but as an insurer. W. U. Telegraph Co. v. Blanchard, 45 Am. Rep., p. 480, and cases there cited." It is doubtless true that, although it is sometimes impossible, with all the care that can be applied, to foresee and avoid errors in transmission, it is usually within the power of the agents of the telegraph companies to ascertain the identity of persons delivering messages for transmission, but this only makes it easier to impute negligence in the latter case than in the former, and constitutes no reason why there should be a warranty in one case and not in the other. Negligence and fraud aside, there is no better reason for a liability in one case than in the other; for, except as proper care may guard against them, the actions of strangers to their business are as much beyond the control of telegraph companies as are the influences which cause mistakes. The dangers to be apprehended from fraud and collusion of servants also exists in one instance as well as in the other. A rule which would require an absolute warranty of the genuineness of telegrams, would neces-

sarily make it the duty of telegraph companies to ascertain the identity of every person who tenders a message, and must, in justice, authorize them to refuse to receive a message without such identification. This would hardly be consistent, in many supposable cases, with the duty which they owe to the public to receive and promptly send telegrams tendered to them. They are, of course, neither bound nor authorized to send forged telegrams, but, as it is true that in some cases they can not while in others they can, with proper care, distinguish the genuine from the false, the true ground of liability must be negligence. Such representation as there was in the delivery of the telegram of plaintiff was therefore not broader nor more absolute than the duty which rested on the defendant. It was qualified by the nature of the service which defendant undertook to perform and meant only that so far as, by the exercise of proper foresight and care, defendant could know, the message came from John Woods Sons. As the defendant and its servants did not know of the fraud, the case comes down to the question whether or not they were guilty of negligence in allowing themselves to be thus deceived by the use of their own apparatus—in other words, were they guilty of negligence? Both the District Court and the Court of Civil Appeals so held, and the remaining question for us to consider is, whether or not there is evidence of negligence to support the verdict of the jury.

When the plaintiff proved the delivery of the message, the loss resulting from reliance and action on it, without negligence on its part, and that no such message had ever been sent by John Woods Sons, it made out a case calling for the production of evidence from the defendant to exculpate itself. Elwood v. Telegraph Co., supra; Turner v. Hawkeye Tel. Co., 41 Iowa, 461; Ryan v. Missouri K. & T. Ry. Co., 65 Texas, 13. The defense offered is that the defendant had itself been imposed upon and made the innocent medium through which a false representation was made to plaintiff. The deception was practiced partly by means of defendant's own wires, instruments and servants, of which it should have had exclusive control. Under the circumstances and in view of the duty of defendant to exercise, in the organization and conduct of its business, a degree of foresight and care adequate to give reasonable protection to the immense interests daily dependent on the reliability of the intelligence it carries, we are of the opinion that the defense was not complete with the mere showing that the false message was put upon its wires by strangers and deceived its servants; and that it was incumbent on the defendant to make it appear that this was accomplished despite the exercise of the care incumbent on it. Nor is this met by proof that the agent at Uvalde was not in fault. Admitting that he was without fault, the question still remains, was it not in the power of the defendant, had it exercised reasonable foresight, to have prevented the fraud by furnishing him and its other agents with means of detecting it? The evidence shows that this business is open to the perpetration of such frauds at any time by a device so well known that

one of the defendant's operators was able to describe, without having seen, the method by which it was perpetrated. If this is true to-day it has been true for all the time telegraphs have been in use. The evidence suggests that the weakness consists in the absence of any means by which one operator may be enabled to determine whether a message comes from another office. The question at once arises, whether or not, with proper foresight, some regulation might not have been devised to remedy this and prevent, or render more difficult, the accomplishment of the designs of swindlers? So far as the evidence goes, it tends to answer this question in the affirmative. If the defendant had made any regulation or adopted any code of signals or made any provision against this known danger, the evidence fails to disclose the fact, unless the signals stated at the outset constituted one. If these were designed for this purpose, which is not shown, then the servant of the company was in fault in defeating that purpose by disclosing the call for Uvalde, and it would be difficult to answer the view of the Court of Civil Appeals that this was, of itself, sufficient evidence of negligence. It is reasonably apparent, however, that the agents did not treat these matters as having any such signification, and we are inclined upon the whole evidence to accept their view. The case then stands in this attitude: the defendant is engaged in the business of conveying from place to place intelligence, often of vast importance in business and other affairs; it invites the confidence of the public that its service is as reliable as the exercise of care and foresight commensurate with the importance of the interests involved can make it; at the same time it is, to its knowledge, exposed to a constant danger of being made, through the use by swindlers of its own appliances and servants, the instrument of fraudulent deceptions upon its patrons; and when such a deception has been accomplished upon one, it does not show that it had taken any precaution against it, or that none was practicable. We are unwilling to establish the first precedent that a defense going no further than this is sufficient, and to hold that the jury were not warranted in this state of the evidence in finding that defendant was guilty of negligence. If it be urged that the burden was on plaintiff to show negligence, the answer is that it did show that the company was apparently in the wrong in delivering a false telegram. The defendant, charged with the duty which, as we have seen, rested upon it, should have shown, not only that it was ignorant of the falsity of the message, but that it was justifiably ignorant. It could not establish this without showing that the imposition upon it occurred notwithstanding the use of proper care on its part. The character, necessities and limitations of its business, as well as its regulations and modes of conducting it, were best known to it. In the arrangement and conduct of this business it commands the best skill that can be had, and it is peculiarly in its power to develop and explain all that should be known to court and jury in the determination of the questions like that before us. Ryan v. Railway, supra.

We have said that no showing was made of the impracticability of making provision against such frauds. We say this because the employes of the defendant who testified seem to express the opinion that such provision could have been made, and such of their testimony as tends the other way is so vague and unsatisfactory that the jury were not bound to accept it. Whether or not swindlers might be able to circumvent the best safeguards that could be erected is not the question. The better the safeguards, the more improbable that such frauds would be attempted, or, if attempted, would succeed. The defendant makes good its defense when it shows that it has done all that due care and foresight would suggest, and if loss occur in spite of this, it is not liable; but, without such showing, it does not appear to have been innocent in its apparently wrongful act by which plaintiff was deceived.

*Affirmed.*