22733.   JENKINS et al. v. COBB et al.

Decided August 26, 1933.   Rehearing denied September 9, 1933.

E. W. Jordan, for plaintiffs.

Howell, Heyman & Bolding, Evans & Evans, for defendants.

Guerry, J.   Jenkins and Ryan, brokers, residing in New York City and engaged in the purchase and sale of cotton for customers, for cash or on margin, for instant or future delivery, sued Steve Cobb and the Western Union Telegraph Company, alleging that Cobb individually and as agent of the said telegraph company entered into a scheme or plan with one T. W. Benson, who was alleged to be irresponsible and insolvent, whereby Cobb, as agent of the telegraph company and as a party to such fraudulent scheme or plan, sent over the wires of the telegraph company to the plaintiffs in New York City a series of false, fraudulent, and fictitious telegrams which were delivered to them by said telegraph company in that city.   Each telegram so sent was set out in detail in the petition and was in substance as follows (the following are used as illustrations showing the general plan ) :  "September 20, 1928. Warthen, Georgia.   Jenkins and Ryan, New York City.   Remitting one thousand dollars credit B. W. Thomas. [Signed] Warthen

Banking Company." From September 20 to October 1 telegrams similar to the above were sent, for various amounts, some using the name of B. W. Thomas and some using the name of J. B. Pierce, and were delivered to Jenkins and Ryan in New York City, aggregating approximately $5,000. On the dates on which these fictitious telegrams were sent, other telegrams, purporting to be from B. W. Thomas and J. B. Pierce, were sent to the plaintiffs, authorizing the buying or selling of cotton. The following is an illustration: "Warthen, Georgia, September 20. Jenkins and Ryan, New York City. Sell three December days trade. [Signed] B. W. Thomas;" to which petitioners replied by telegram, "B. W. Thomas, Warthen, Georgia. Sold 250 Dec. 17.56 days trade thanks. Margin $2.00 per bale. [Signed] Jenkins and Ryan." Various other telegrams authorizing the buying or the selling of cotton were sent and replies made thereto during the period from September 20 to October 1, and it was alleged that all these telegrams were acted upon by the plaintiffs, they relying upon the false, fictitious, and fraudulent telegrams received by them and transmitted by the defendants, purporting to be from the Warthen Banking Company, and that a stated loss was occasioned to them as the direct and proximate result of the acts and conduct of the defendants in receiving, transmitting, and delivering to them, knowingly, the false, fictitious, and fraudulent telegrams; and that the same would not have been acted upon had petitioners not believed and relied upon such false and fraudulent telegrams. It was alleged further that all the telegrams were false, fictitious, and fraudulent on the part of Steve Cobb and the Western Union Telegraph Company; that there was no such institution as the Bank of Warthen; that there were no such persons as Pierce and Thomas, and that the entire transaction was a part of a false and fraudulent scheme on the part of the defendants and one Benson to defraud the plaintiffs; that all of said orders were executed by plaintiffs and cotton bought or sold as indicated by the orders and replies thereto, all of which are set out in detail in the petition; that relying on the genuineness and verity of the telegrams from the Warthen Banking Company reciting that customers or purported customers had caused the Warthen Banking Company to remit to them sufficient margin at $2 per bale to cover all orders, the plaintiffs executed all of said supposed orders and bought or sold according to instructions, and

as a result thereof sustained a loss on the Pierce orders of $1600, and on the Thomas orders of $2501.50. Losses occurred in the following manner: (These transactions used as illustrations.) On September 20, the plaintiffs, on telegram of B. W. Thomas, bought 150 bales of cotton for December delivery at a price of 17.70 per pound, which cotton was, on telegraphic order of B. W. Thomas, sold on the same day for 17.56 per pound, or a net loss of $105. On September 20 the plaintiffs sold, on telegram of B. W. Thomas, 100 bales of December cotton at 18.26 per pound to cover, sustaining a loss thereon of $350. It was alleged that the petitioners themselves bought from Thomas and Pierce, or sold to Thomas and Pierce, upon the orders so received. By amendment it was set up that whenever they had sold an amount of cotton in excess of the amount bought they would, by collateral contracts with other parties, buy or sell to cover their "net position," and that a loss resulted to them by reason of such collateral contracts which were set out, and were alleged to have been made as a result of the orders sent to them by Thomas and Pierce. Further allegations were made, explaining the meaning of the terms in the telegrams, such as that "buy Dec." meant buy for December delivery, and that "margin $2 a bale" meant that the customer was making a deposit of $2 a bale in order to make the trade effective and to bind the parties to the contract. It was alleged that before executing the orders for purchase or sale of cotton, petitioners required the customers to deposit with them $2 per bale in order to protect them from loss should the market in the product bought or sold decline or advance, as the case might be, below or above the price at which the order was executed, and that the usual method whereby money was deposited with petitioners for such purposes was by telegraphic assurances from banks throughout the country that they were remitting for the account of a particular customer a stated amount of money. The court sustained a general demurrer to the petition as amended, and the plaintiffs excepted.

■ We wish to consider this petition from two viewpoints: the one is whether or not the allegations of fraud are sufficient to set out a cause of action, and the other is whether or not the allegations of damages are such as would make the defendant legally liable. An action for deceit is an action sounding in tort. *Brooke* v. *Cole,* 108 *Ga.* 251 (33 S. E. 849); *Rutherford* v. *Irby,* 1 *Ga. App,* 499 (57

S. E. 927); *Echols* v. *Howard,* 17 *Ga. App.* 49 (86 S. E. 91). "A telegraph company negligently delivering forged dispatches is liable for the damage thereby sustained." Strauss *v.* Western Union Telegraph Co., 8 Biss. (U. S.) 104. "A telegraph company is liable for fraud and misfeasance in sending a false and fraudulent message to an addressee who acts thereon to his damage." McCord *v.* Western Union Telegraph Co., 39 Minn. 181 (39 N. W. 315, 1 L. R. A. 143, 12 Am. St. R. 636). "An addressee may sue a telegraph company for delivering forged telegram on which he, in good faith, acted to his damage." State Bank *v.* W. U. Tel. Co., 19 N. M. 211 (142 Pac. 156, L. R. A. 1915A, 120). "Where a telegraph operator forges a telegram and the forgery is a proximate cause of the injury to another, he is entitled to maintain a civil action for damages against the telegraph company." Usher *v.* Western Union Telegraph Co., 122 Mo. App. 98 (98 S. E. 84); Palo Alto Bank *v.* Pacific Postal Telegraph-Cable Co., 109 Fed. 369. "Fraud may be consummated by signs, tricks, or agents employed to deceive, or any other unfair ways used to cheat another." Civil Code (1910), § 4625. "Wilful misrepresentation of a material fact made to induce another to act, upon which he does act to his injury, will give a right of action." Civil Code, § 4410. In case of Wells *v.* Western Union Telegraph Co., 144 Iowa, 605 (123 N. W. 371, 24 L. R. A. (N. S.) 1045, 138 Am. St. R. 317), we find the following: "A telegraph company, . . owing a duty to all applying to it for service, can not be a party to an actionable fraud by transmitting a fictitious message, without incurring liability to all parties interested in the transmission and delivery." Quoting further from the 7th headnote: "A telegraph company does not necessarily have to know the details of the business to which the message applies, it is sufficient if the results likely to follow the breach may be gathered in a general way from the sending of the message." Quoting further from the same opinion: "Here the defendant received what was equivalent to a forged, spurious, and fictitious writing, knowing its character, and having notice or knowledge of the maker's intent to defraud. This he undertakes to deliver to a third person in order that it might be used and relied upon by him. He does deliver it to the person to whom it is addressed; . . can there be any doubt of the right of the holder of the writing to act upon

this writing so transmitted and recover damages sustained by him? We think not." In the case of Elwood *v*. Western Union Telegraph Co., 45 N. Y. 549 (6 Am. R. 640), it was said: "It is gross negligence in the operator at a telegraph station to send over the wires a message in the name of and purporting to be from the cashier of a bank and to be dated at another station, at the request of a party known to the operator not to be such cashier and presenting no evidence of the authority to use his name, which message is addressed to a banking house, held out such party as being entitled to credit for a large amount; and this negligence occurs so within the scope of the employment of such operator as to make the telegraph company liable to the person to whom such telegram was addressed for the damage occasioned by such negligence." See also, in this connection, Western Union Telegraph Co. *v*. Uvalde Bank, 97 Texas, 219 (77 S. W. 603, 65 L. R. A. 805, 1 Ann. Cas. 573); State Bank *v*. Western Union Telegraph Co., 52 Cal. 280.

Under the cases cited above there seems to be no room for doubt that where an agent of a telegraph company wilfully, knowingly, and fraudulently sends a false and fictitious message to an addressee, the company thereby becomes liable for any damages occasioned as a result of the sending of the message. This seems to be true whether there is a forgery of the message in the name of a real and solvent person or there is an invention of a fictitious person intended to deceive and which does actually deceive the addressee and cause him to act to his own hurt and damage. There seem to be no cases in Georgia directly in point. According to the principle laid down in the case of *Gardner* v. *Western Union Telegraph Co.*, 14 *Ga. App.* 403 (81 S. E. 259), as a condition precedent to the recovery of damages it must be alleged and shown that the purported sender, upon the strength of whose alleged telegram credit was extended, was a person able to respond in the event the messages had been genuine, for it was credit extended to this person, after all, that caused the extension of credit and consequent loss. In that case, however, there was a real person who was the purported sender of the message, while in this case the purported sender was fictitious, and therefore there could be no allegation here that the sender was solvent and able to respond. However, irrespective of the soundness of the reasoning for such a holding in that case, we hold, under the authority of a long line of decisions directly in point from

other States, and without exception so far as we have been able to discover, that where an operator of a telegraph company assists in the promotion of a fraudulent scheme, and in such scheme assists in representing the genuineness of a bank which in fact has no existence, and this fact is well known to the operator, and, in carrying out the purpose of the fraudulent scheme, he wires a brokerage house in New York City from the purported bank, saying that such bank is remitting money to such brokerage house, and as a part of such scheme wires buying and selling orders, based on the money so sent by the fictitious bank, the telegraph company can not escape liability to the addressee who relies on the authenticity and genuineness of the message and acts to his injury and damage.

The plaintiffs in this case lived in New York; they received a telegram delivered to them by the Western Union Telegraph Company, stating that the bank of Warthen was remitting to them the sum of $1000. The telegram was signed, "Warthen Banking Company." It is certainly a sufficient allegation to withstand a general demurrer to say that it could have been and was deceived thereby. Plaintiffs had a right to rely on the genuineness of a telegram so sent, *not as to the solvency of such bank, but at least of the reality of the existence of such bank.* It would be true that if the addressee had notice of the nonexistence of such bank or had sufficient cause to put it on notice to make inquiry in reference to the same before acting thereon, it could not recover, for the reason that if the falsity of the telegram were known, it could not recover, irrespective of its falsity. If any issue as to this should arise, the facts might be determined by the jury; for purposes of demurrer the petition is sufficient as to this point.

█ The next question to be considered is, did the petition sufficiently allege damage to the plaintiff? It is insisted by the very able counsel for the defendant in error that all the plaintiff alleges that he lost were prospective profits, and that he may not recover such profits, because they were too vague and remote to be determined with any degree of accuracy. The petition as amended states that all the transactions with reference to the purchase or sale of cotton were with the petitioners. Notwithstanding the fact that the plaintiffs sell their own cotton to their customers and buy from their customers the customers' own cotton, we are of the opinion that the supposed profits sued for are such as may be legitimately

recovered. "Remote or consequential damages are not allowed whenever they can not be traced solely to the breach of the contract, or unless they are capable of exact computation, such as the profits which are the immediate fruit of the contract, and are independent of any collateral enterprise entered into in contemplation of the contract." Civil Code (1910), § 4394. In *Anderson v. Hilton & Dodge Lumber Co.*, 121 *Ga.* 688 (49 S. E. 725), an action was brought alleging that the plaintiff sold to the defendant certain standing timber to be sawed into lumber, and, after the defendant had moved and located his mill for the purpose of cutting the timber, the plaintiff stopped and prohibited the defendant from cutting the timber, and he was thereby compelled to shut down his mill and lose the profits he would have otherwise made. It was held that the damages sued for were not too remote or speculative, and were not dependent on some other business or enterprise, but that the plaintiff had a right to assert a claim for damage occasioned by his being prevented from making the profits which would have been the immediate fruits of the contract. In the case of *Central of Georgia Ry. Co.* v. *Cooper*, 14 *Ga. App.* 738, 740 (82 S. E. 310), it was said: "And therefore, while imaginary and speculative profits can not be recovered as damages, profits which would have been received but for the acts of the defendant may be recovered as damages when there are criteria, definite and certain, upon which an adjudication can be based." In the case of *Carolina Portland Cement Co.* v. *Columbia Imp. Co.*, 3 *Ga. App.* 485 (60 S. E. 279), it was said: "It is well settled that profits which were in the contemplation of both parties and which are not conjectural and speculative can be recovered. . . A loss of profits is always a proper subject for compensation, if such a loss of profits can be shown with reasonable certainty and without resorting to speculation or conjecture. 2 Mechem on Sales, § 1704. Furthermore, the profits sued for in this case are recoverable because they are the direct, immediate fruits of the contract. . . *Stewart* v. *Lanier House*, 75 *Ga.* 582; *Van Winkle* v. *Wilkins*, 81 *Ga.* 93 (7 S. E. 644, 12 Am. St. R. 299)." If A tells B to buy for his account 100 bales of cotton at the price of 17.70 per pound and B executes the trade either by selling his own cotton or by buying it from others as agent for A, A thereby becomes the owner of the 100 bales of cotton. If B has on hand a sufficient amount of cash belonging to

A to pay therefor and does pay therefor, can it be said that if he afterwards sells the 100 bales of cotton for 17.56 per pound, on the order of A, that A will not have suffered a loss of 14 points on the pound on such cotton and will have that much less money at the conclusion of the trade. If B, instead of having such money on hand, relies on the genuineness of the telegram sent him from the bank, that money to cover said purchase was being remitted, uses his own credit to buy such cotton, and then sells such cotton acting as agent for A, can it be said that a loss will not have been sustained by B for which A is liable? Can it be said that because B delivers cotton which he owns himself to A, and then buys the same cotton back from A, he has suffered no loss. These are profits which are the immediate fruits of the contract and are independent of any collateral enterprise. It might be further suggested that when A sells cotton to B at the price of 17.70 per pound which is the market price at that time, he is thereby deprived of the opportunity of selling such cotton to any one else and necessarily suffers a detriment because of his agreement and sale of the cotton to B. If the cotton should go up in price it would belong to B and he would get whatever profits might accrue. In the case of *Jester* v. *Bainbridge State Bank*, 4 *Ga. App.* 469 (4) (91 S. E. 926), it was said: "Damages to either party to a contract, to be recoverable, must be the result of some act on the part of the other party, and the measure of such damages is the profits, if legally ascertainable, which would have accrued had the contract been complied with." See also *Haas* v. *Marks*, 158 *Ga.* 267 (123 S. E. 109). It might be well to consider, in this connection, section 4511 of the Civil Code, which reads as follows: "If, however, the tort is committed or the contract broken, or the duty omitted, with a knowledge and for the purpose of depriving the party injured of such benefits as are specified in the last paragraph, then the remote damages are made, by such knowledge and intent, a proper subject for consideration by the jury."

On the trades alleged to have been made on the direct telegraphic orders of the supposed parties to the contract, the plaintiff would be entitled to recover any profits capable of exact computation and legally ascertainable which would have been made under the terms of the contract of purchase or sale as made. Those contracts entered into on October 1, which upon discovery of the alleged fraud

the plaintiff elected to rescind by using its own judgment as to the time and place of sale and without waiting until the date of delivery to determine the market value, are not transactions upon which either of the defendants in this case or Benson would be responsible. Under the Civil Code, § 4131, "If a purchaser refuses to take and pay for goods bought, the seller may retain them and recover the difference between the contract price and the market price at the time and place for delivery; or, he may sell the property, acting for this purpose as agent for the vendee, and recover the difference between the contract price and the price on resale; or he may store or retain the property for the vendee and sue him for the entire price." Where Pierce and Thomas buy cotton at a certain price to be delivered in December, the damage, if any, may not be determined until the time and place of sale, or unless the seller has complied with the provisions of the above code section. The petition alleges that the plaintiffs used their own judgment and in effect rescinded the trade and sold the cotton on October 6. It does not appear what was the market price at the time and place of delivery and whether there would or would not have been a loss, and for that reason the plaintiffs would have no right to recover on the contracts when they did not follow the instructions of the buyers, but in effect rescinded the contracts and used their own judgment. It is also true that no cause of action is set forth with reference to any collateral contracts made with the Rall Cotton Company or other parties which were not authorized by Pierce and Thomas, but which were private undertakings of the plaintiffs and which in no manner bind Pierce and Thomas or these defendants. The court erred in dismissing the petition on general demurrer.

*Judgment reversed. MacIntyre, J., concurs specially. Broyles, C. J., dissents.*

MacINTYRE, J., concurring specially. This is a suit for a tort and damage must be shown. Where it is alleged that A instructs B, a broker, to buy articles at a certain price, and the broker follows the instructions, and A afterwards instructs the broker to sell the articles at a reduced price, and the instructions are followed, and the broker thereby loses a named amount of money, the allegations are rather allegations of actual loss or damage than allegations of loss of profits, and the amount of the broker's loss is recoverable.

BROYLES, C. J., dissenting. In my opinion, the petition as finally amended, properly construed (most strongly against the plaintiff), fails to set out any recoverable item of damages, and the court did not err in sustaining the general demurrer.