A94A2003. BLUE RIDGE MOUNTAIN FISHERIES, INC. et al. v. DEPARTMENT OF NATURAL RESOURCES et al.
(456 SE2d 651)

BEASLEY, Chief Judge.

This case comes to us on the denial of plaintiffs' motion for partial summary judgment and the grant of defendants' motion for summary judgment. It is an action based on 42 USC § 1983 and state tort law.

On May 1, 1990, the Georgia Department of Natural Resources (DNR) searched the Wilson Spring Fish Hatchery owned by Blue Ridge Mountain Fisheries, Inc. Officers seized approximately 1,223 white sturgeon fish being held for breeding and eventual caviar production. David Cochran, president and principal stockholder of Blue Ridge, was arrested. He was charged with violating OCGA § 27-5-5 (b) (6), based on allegations that the sturgeon were "exotic fish" possessed by him without a wild animal permit. The fish were seized as contraband pursuant to OCGA § 27-5-8 (a).

In 1977, the General Assembly enacted the "Game and Fish Code." OCGA § 27-1-1 et seq. Under it, animals and fish are generally classified as either domestic species, wildlife, or wild animals. A license or permit is generally required for all wild animals either listed in OCGA § 27-5-4 or OCGA § 27-5-5, or specified by regulation of the board pursuant to either Code section. OCGA § 27-5-5 (b) (6) lists as

wild animals "[a]ll exotic fish which are not held in aquaria or tanks." Neither the Game and Fish Code nor any DNR regulation contained any definition of "exotic fish" when the DNR seized the plaintiffs' sturgeon.

Apparently, as evidenced by a trade journal article from 1987 submitted by appellees, it has been the DNR's position that under the Game and Fish Code, the term "exotic fish" means all fish species not native to Georgia. The DNR held this position notwithstanding the fact that in the fisheries trade or profession, the generally accepted meaning of the term "exotic fish" is fish "not native to the country where found" (just as the generally accepted meaning of the term "exotic" is "not native to the country where found"). The stated reason for the DNR's more inclusive definition is that the introduction into Georgia lakes and streams of fish not native to Georgia, even though native to other parts of the United States, poses dangers to Georgia's native fish.

Cochran began fish farming in this state in 1975. An outspoken critic of the DNR, his primary objection was to the DNR's position that pond-raised fish are wildlife and thus subject to state ownership and regulation. His position was that they are domestic species. He maintains that in the early 1980's, Ledbetter (then Commissioner of the DNR), Kirkland (then Director of the Game and Fish Division of the DNR), and Gennings (Chief of the Fisheries Section of the Game and Fish Division) told him of their opposition to his position because its acceptance would result in a loss to the DNR of major revenue sources. He also testified that the DNR used its veto power with the United States Corps of Engineers in an attempt to block an application by Blue Ridge to dam a creek in Gilmer County for the purpose of building a trout farm. Another member of Georgia's aquaculture industry testified that after state legislative hearings in 1987 at which Cochran made certain accusations against the DNR, Gennings threatened to "get" him.

The first investigation of Cochran began in May 1987. In 1988, he was arrested by DNR rangers at Blue Ridge's Price Creek Fish Hatchery and charged with possession of "exotic fish" without a wild animal permit. The fish were Coho Salmon, which are native to the United States but not to Georgia. As a result of the state charges, the United States Fish and Wildlife Service charged Cochran and Blue Ridge with violations of the federal Lacey Act. In 1989, all Lacey Act charges were dismissed against Cochran, but Blue Ridge entered an *Alford* plea to one Lacey Act misdemeanor and was placed on probation. This did not constitute either admission on the part of Cochran or a judicial determination that the salmon or other fish native to the United States but not to Georgia are "exotic fish." In entering an *Alford* plea, which must be voluntarily and intelligently arrived at, a

defendant claims innocence but concludes it is in his best interest to do so. *Freeman v. State*, 211 Ga. App. 716, 717 (1) (440 SE2d 490) (1994). The underlying state charges were dismissed in April 1990.

According to Kirkland, the second investigation of Cochran began in 1989 because of information received by the DNR from special investigators that Cochran and Blue Ridge were committing continuing violations of Georgia's game and fish laws. DNR investigator Parrish testified that during the course of a state-wide investigation into unlicensed commercial hatcheries in October 1989, it was determined that the Wilson Spring Fish Hatchery and another hatchery were being operated without a commercial license, and that in March 1990 investigators went to the Wilson Spring Hatchery for the first time and discovered the white sturgeon.

Cochran testified that in the spring of 1990, he secured financing commitments for the sturgeon project, one condition of which was elimination of the conflict between him and the DNR. He wrote a letter in March to Gennings, stating that he wanted to discuss the required permits for his planned production of the sturgeon as well as salmon. He also purchased a license for his Price Creek Hatchery. Although he was advised by letter from Gennings that licenses were required for each hatchery, he did not purchase any additional licenses.

After the sturgeon were observed at the Wilson Spring Hatchery, Parrish asked Black (the Chief of the Law Enforcement Section of the Game and Fish Division) for an opportunity to discuss this finding. On April 3, 1990, a meeting was convened by Kirkland. He and Gennings were present, as was Primmer (DNR Regional Supervisor and Fishery Biologist), Walden (executive legal assistant to the DNR Commissioner), and others. The question for decision was whether the sturgeon should be seized as contraband. Walden testified that based on the expertise of the biologists, it was the collective opinion of the meeting participants that the sturgeon, being a fish not native to Georgia, constituted an "exotic fish" under the Game and Fish Code and that Cochran's possession of the sturgeon was thus unlawful. No final decision was made at the meeting.

Thereafter, Gennings sent Walden a memo recommending prosecution of Cochran for, among other things, possession of white sturgeon without a wild animal license. He referred to Cochran's longstanding and "blatant disregard" of Georgia's game and fish laws, and he stated that in order to maintain credibility with other members of Georgia's aquaculture industry, it was necessary for the DNR to respond to Cochran's "frontal assault" on state laws. He also expressed concern that the white sturgeon posed a threat to Georgia's indigenous sturgeon. Walden then sent Ledbetter a memo recommending that Cochran be prosecuted for, among other things, possession of sturgeon without a wild animal license. He expressed the opinion that

the General Assembly would not view the prosecution as harassment.

Several days after Walden sent the memo, sturgeon were again observed at the Wilson Spring Hatchery. Gennings and Primmer later saw Cochran and informed him that a wild animal permit was required for raising sturgeon and Atlantic salmon. Ledbetter subsequently approved a raid on the hatchery and seizure of the sturgeon. Parrish filed an affidavit for a warrant to search the Wilson Spring Hatchery, stating that Cochran was in possession of exotic fish without a wild animal license. He also filed an affidavit for a warrant for Cochran's arrest for possession of exotic fish without a wild animal license. After the arrest, Parrish offered to allow him to sell the sturgeon in another state if he would agree not to file a civil action against the DNR under OCGA § 27-5-8. He refused.

Instead, he and Blue Ridge filed a civil action under OCGA § 27-5-8 (b) to recover the sturgeon. The superior court declared the DNR's seizure of the sturgeon illegal. The court noted the dictionary definition of the term "exotic," the generally accepted definition of the term "exotic fish" in the fisheries profession, and the variance between these definitions and the definition of "exotic fish" adopted by the DNR. The court held that insofar as OCGA § 27-5-5 (b) (6) criminalized the possession of "exotic fish," it was unconstitutionally vague and that, in any event, sturgeon were not "exotic fish" as defined by the statute.

The court premised its constitutional holding on due process principles applied in *Price v. State*, 253 Ga. 250 (319 SE2d 849) (1984), and *Bullock v. City of Dallas*, 248 Ga. 164 (281 SE2d 613) (1981). As held in *Price*, supra at 251, "Due process mandates that criminal laws give adequate warning of what conduct will constitute a crime. '(A) statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' [Cits.]" As held in *Bullock*, supra at 166, " 'No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.' [Cit.]"

After the superior court ruled, the criminal charges against Cochran were dismissed.

Cochran and Blue Ridge subsequently instituted this action against Ledbetter, Kirkland, Gennings, Primmer, and other DNR employees later dismissed without prejudice. Plaintiffs charge the defendants, along with Black, Parrish, and Walden, with having acted as co-conspirators/joint tortfeasors in creating the crime of unlawful possession of white sturgeon by private agreement. Plaintiffs have asserted state tort claims, as well as claims under 42 USC § 1983 for deprivation of various constitutional rights.

After plaintiffs instituted this action, the Georgia Supreme Court, in reliance on *Price*, supra, held that the superior court did not err in holding that OCGA § 27-5-5 (b) (6) was void for vagueness. *Dept. of Natural Resources v. Blue Ridge Mtn. Fisheries*, 262 Ga. 305 (417 SE2d 12) (1992). During the pendency of that appeal, the General Assembly amended OCGA § 27-5-5 (b) (6) to provide that exotic fish are all fish species not native to Georgia. Following the Supreme Court's decision, plaintiffs amended their complaint in this case to specifically allege due process and First Amendment violations. On cross motions by defendants for summary judgment and by plaintiffs for partial summary judgment, the trial court granted defendants' motion and denied plaintiffs'.

1. The court erred in ruling that under federal law (42 USC § 1983) defendants are entitled to qualified immunity from plaintiffs' constitutional claims.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Rich v. Dollar*, 841 F2d 1558, 1563 (2) (11th Cir. 1988).

It is clearly established that as a matter of due process, criminal laws must give adequate warning of the conduct that will constitute a crime and that a statute may not forbid the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. It is also clearly established that according to its generally accepted definition in the fisheries trade or profession, the term "exotic fish" means fish not native to the country where found. In making a decision to prosecute plaintiffs for a criminal violation of the Georgia Game and Fish Code, based on a definition of "exotic fish" different than its generally accepted definition and not codified or set forth in any promulgated regulation, the DNR officials violated clearly established due process rights of which a reasonable person should have known and were acting outside their discretionary authority. Thus, they are not entitled to qualified immunity.

2. The court erred in granting summary judgment to defendants on plaintiffs' Fourth Amendment claim of unlawful seizure, but not on their claim of illegal arrest.

As to the seizure, the court concluded that under the facts of this case, defendants could have reasonably believed that plaintiffs had violated OCGA § 27-5-5 (b) (6). See *Anderson v. Creighton*, 483 U. S. 635 (107 SC 3034, 97 LE2d 523) (1987). For the reasons given in Division 1, we disagree.

With respect to the arrest, the court found that Cochran was arrested under warrants charging him with violation of OCGA § 27-4-75

as well as OCGA § 27-5-5 (b) (6), and that his arrest under OCGA § 27-4-75 was not unlawful. We agree. There is no merit in plaintiffs' argument that there is an issue of fact as to whether Cochran's arrest for violating OCGA § 27-4-75 was pretextual. The record shows that the investigation of Cochran began because of his violation of OCGA § 27-4-75.

3. The court erred in granting summary judgment to defendants on plaintiffs' due process claims.

Citing *Hudson v. Palmer*, 468 U. S. 517 (104 SC 3194, 82 LE2d 393) (1984), and *Parratt v. Taylor*, 451 U. S. 527 (101 SC 1908, 68 LE2d 420) (1981), the court held that OCGA § 27-5-8 establishes a meaningful post-deprivation remedy for the DNR's seizure of the fish and, since plaintiffs have successfully employed this remedy to recover possession of the seized fish, their due process claim fails.

These cases hold that where state employees either negligently or intentionally deprive the plaintiff of property through a random unauthorized act, as opposed to an established state procedure, tort remedies which the state provides as a means of redress for property deprivations satisfy the requirements of due process. See *Zinermon v. Burch*, 494 U. S. 113 (110 SC 975, 108 LE2d 100) (1990). The fish were seized under a search warrant which was issued by authorization from the Commissioner of the DNR. This constituted a deprivation of property by way of an established state criminal procedure the implementation of which was authorized by an official act. Consequently, plaintiffs have a claim for a pre-deprivation denial of due process, notwithstanding the availability of a post-deprivation remedy.

4. The court erred in dismissing Cochran's First Amendment claim on the ground that it is barred by the statute of limitation.

In Georgia, OCGA § 9-3-33 provides the period of limitation for § 1983 claims. *Day v. Brown*, 207 Ga. App. 134 (1) (427 SE2d 104) (1993). It generally allows two years after the right of action accrues, which occurs upon the infliction of injury. *Burns v. Brickle*, 106 Ga. App. 150 (126 SE2d 633) (1962).

The original complaint was filed within two years after the infliction of the injury, and Cochran asserted his First Amendment claim in an amendment to it. Although any First Amendment expression by Cochran arose out of activities engaged in by him in the 1980's, his First Amendment claim arose out of the DNR's seizure of the sturgeon in 1990. The amendment to the complaint did not assert an entirely new cause of action based on wholly different facts. In consequence, it related back to the date of the original complaint. OCGA § 9-11-15 (c); see generally *Henson v. American Family Corp.*, 171 Ga. App. 724, 732 (8) (321 SE2d 205) (1984).

5. The court erred in granting summary judgment to defendants on the claims for wrongful deprivation of personalty and damage to it.

Summary judgment was premised upon the conclusion that the seizure of the sturgeon was lawful. However, as held in Division 2 and by the superior court in the prior action by plaintiffs against the DNR under OCGA § 27-5-8 (b), the seizure of the sturgeon was unlawful.

6. The court did not err in ruling that defendants are not liable to Cochran for false arrest and imprisonment.

The arrest was not unlawful. See Division 2.

7. The court did not err in ruling that plaintiffs' claim for lost profits must fail since the evidence shows that Blue Ridge does not have any history of making profits. See *Shaw v. Ruiz*, 207 Ga. App. 299, 303 (11) (428 SE2d 98) (1993).

Plaintiffs argue that they are entitled to recover profits which would have been obtained in raising the sturgeon under OCGA § 51-12-10: "When a tort is committed, a contract is broken, or a duty is omitted with knowledge and for the purpose of depriving the plaintiff of certain contemplated benefits, the remote damages occasioned thereby become a proper subject for the consideration of the jury." According to this Code section, a defendant who acts knowingly for the purpose of bringing about an injury may be held liable for the damages traceable to his tortious act, even though such act would not otherwise be the legal or natural cause of the damages. *Hodge v. Dixon*, 119 Ga. App. 397 (167 SE2d 377) (1969); see *Jenkins v. Cobb*, 47 Ga. App. 456 (170 SE 698) (1933). This exception to the rule against recovery of remote damages does not authorize the recovery of anticipated future profits by a business that has not made any profits in the past. Such damages cannot be recovered for the reason that they are not provable rather than that defendant's act is too remote.

*Judgment affirmed in part and reversed in part. Johnson, J., concurs. Andrews, J., concurs in the judgment only.*

DECIDED MARCH 16, 1995 —
RECONSIDERATIONS DENIED MARCH 30, 1995 —

*Kinney, Kemp, Pickell, Sponcler & Joiner, F. Gregory Melton, Tracey S. Witt, Douglas W. Brown, Jr., Weaver & Weaver, George W. Weaver, Cook & Palmour, Bobby Lee Cook, for appellants.*

*Michael J. Bowers, Attorney General, Isaac Byrd, Robert S. Bomar, Senior Assistant Attorneys General, for appellees.*